**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

KENNETH TROUTT,
Plaintiff-Appellee,

v.

No. 95-2736

STAVOLA BROTHERS, INCORPORATED,
d/b/a Stavola Brothers Racing,
Defendant-Appellant.

Appeal from the United States District Court
for the Middle District of North Carolina, at Salisbury.
William L. Osteen, Sr., District Judge.
(CA-94-417-4)

Argued: January 28, 1997

Decided: March 4, 1997

Before MURNAGHAN, NIEMEYER, and MOTZ, Circuit Judges.

_____

Affirmed by published opinion. Judge Motz wrote the opinion, in
which Judge Murnaghan and Judge Niemeyer joined.

_____

**COUNSEL**

**ARGUED:** Paul Bradford Taylor, VAN HOY, REUTLINGER &
TAYLOR, Charlotte, North Carolina, for Appellant. J. Lynn Bishop,
Charlotte, North Carolina, for Appellee. **ON BRIEF:** Philip M.
Van Hoy, VAN HOY, REUTLINGER & TAYLOR, Charlotte, North
Carolina, for Appellant.

_____

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

A race car body fabricator sued his employer for overtime pay under the Fair Labor Standards Act (FLSA). The employer asserted that the employee was exempt from the overtime provisions of FLSA because he was a "loader" of a private motor carrier whose loading activities affected the safety of the carrier's operation in interstate commerce. After a bench trial, the district court entered judgment for the employee, concluding that he was not a "loader" and so not exempt from the overtime provisions of FLSA. Troutt v. Stavola Brothers, Inc., 905 F. Supp. 295 (M.D.N.C. 1995). We affirm.

I.

From November 1990 to March 1994, Stavola Brothers, Incorporated employed Kenneth Troutt as a race car body fabricator. A fabricator forms raw sheet metal into a race car body.

Stavola builds and races stock cars in NASCAR-sponsored races throughout the United States. In order to compete in races, Stavola transports two stock cars, along with other equipment, in a "transporter," a custom-built tractor trailer. The transporter is assigned a United States Department of Transportation number, which is displayed on its cab door.

After being rolled onto the tracks inside the transporter, Stavola's stock cars are "chocked" and strapped into the tracks. "Chocking" refers to the practice of "the clamping of the race car wheels into the tracks, through the use of a metal chock that attaches to the wheels and is then secured to the track by screws that are bolted onto the track." Id. at 298. After being chocked, a car is secured "with nylon straps that are placed around the wheels and the track" to maintain the car in place. Id.

Troutt and other Stavola employees, including the transporter's driver, testified that it was the driver's responsibility to see that the cars and other equipment were secured when loading the transporter.

2

Thus, the district court expressly found that the driver was the employee "responsible for ensuring that all equipment is secured and stowed in a proper manner." Id. at 298-299. All Stavola employees, however, at one time or another, assisted in some way in packing the transporter. Troutt assisted primarily by moving equipment to the ramp at the end of the transporter and by pushing race cars onto the transporter. Id. at 299. Additionally, on two occasions, Troutt "chocked down" the wheels of a stock car on the track inside the transporter. Id. Troutt testified that other than these two instances of "chocking," he never secured anything inside the transporter. Although a company witness disputed this, other employees generally confirmed Troutt's testimony and the district court found that Stavola had not proved by a "preponderance of the evidence" that Troutt "took part in any other securing of equipment inside the transporter." Id.

When Stavola originally hired Troutt, management agreed that he need not work overtime; he was paid for and worked a 40-hour work week. However, in July 1991, a new general manager required all employees to work significant amounts of overtime, including nights and weekends. Troutt received no additional compensation for any of the extra hours worked. Beginning in January 1992 Troutt contemporaneously recorded his overtime hours. He calculated that he worked more than 1400 overtime hours between January 1992 and March 1994.

After a two-day trial, the district court issued a memorandum opinion, including detailed findings of fact and conclusions of law. The court concluded that Troutt's only loading activities "which could conceivably affect safety of operation fall into th[e] `de minimus' [sic] category" and for this reason Troutt was not exempted from the overtime provisions of FLSA. Id. at 300. Although assessing it a "close question," the district court further found that Troutt had failed to establish that Stavola willfully violated FLSA and so Troutt could only collect overtime pay for hours worked for two years prior to filing suit, i.e. not for the period prior to June 28, 1992. Id. at 302. After examining week-by-week the overtime compensation claimed by Troutt and making adjustments consistent with Stavola's records, the district court entered judgment for Troutt in the amount of $53,091.36

3

-- comprised of unpaid overtime compensation of $26,545.68 and an equal amount in liquidated damages. Id. at 308.

II.

On appeal, Stavola's sole claim is that the district court erred in concluding that Troutt was not exempt from FLSA. Resolution of this question rests on the interaction of two federal statutes -- the Motor Carrier Act and FLSA.

In 1935, Congress passed the Motor Carrier Act, ch. 498, 49 Stat. 543 (1935) (codified as amended at 49 U.S.C.A. §§ 502-507, 522-523, 525-526, 31502-31504 (West 1997)), authorizing the Interstate Commerce Commission (I.C.C.) to establish requirements with respect to qualification and maximum hours for employees of a common carrier, whose work affects the safety of the carrier. Although Congress later transferred these functions to the Secretary of Transportation, and revised some of the language in the statute, the statutory charge itself remains intact. See 49 U.S.C.A. § 31502(b)(2) (West 1997) (Secretary of Transportation may prescribe requirements for "qualifications and maximum hours of service of employees of . . . a motor private carrier, when needed to promote safety of operation"). A "motor private carrier" subject to regulation by the Secretary of Transportation is one that provides transportation on public highways between two states. See 49 U.S.C.A. § 13102(13) and § 13501 (West 1997). Thus, under the Motor Carrier Act the Secretary of Transportation has the authority to regulate the hours of an employee (1) who works for a private motor carrier that provides transportation in interstate commerce and (2) whose work activities affect the "safety of operation" of that motor carrier.

Three years after the passage of the Motor Carrier Act, FLSA was enacted. See ch. 676, 52 Stat. 1060 (1938) (codified as amended at 29 U.S.C.A. §§ 201-219 (West, WESTLAW through Nov. 12, 1996)). FLSA generally empowers the Secretary of Labor to regulate the hours of certain employees. However, Congress expressly exempted from the overtime provisions of FLSA any motor carrier employee over whom the I.C.C. (now the Secretary of Transportation) had the "power to establish qualifications and maximum hours of service" under the Motor Carrier Act. See ch. 676,§ 13, 52 Stat. 1067 (1938)

4

(codified as amended at 49 U.S.C.A. § 31502(b)(2) (West 1997)). This motor carrier exemption from FLSA, like the authority granted under the Motor Carrier Act itself, has never been limited, and so survives in all material respects in current law. See 29 U.S.C.A. § 213(b)(1) (West, WESTLAW through Nov. 12, 1996).

The Supreme Court has examined the interaction between FLSA and the Motor Carrier Act on several occasions. The Court has mandated that the critical consideration in determining whether the Motor Carrier Act governs a motor carrier employee and so exempts him from FLSA is whether that employee's activities"affect safety of operation." United States v. American Trucking Assn's, 310 U.S. 534, 553 (1940). The jurisdiction of the Secretary of Transportation under the Motor Carrier Act is "limited to those [motor carrier] employees whose activities affect the safety of operation. The[Secretary] has no jurisdiction to regulate the qualifications or hours of service of any others." Id. See also Levinson v. Spector Motor Service, 330 U.S. 649, 671 (1947) ("The fundamental test is simply that the employee's activities affect safety of operation."). Motor carrier employees whose activities affect the safety of operation of the motor carrier are covered by the Motor Carrier Act and exempt from regulation under FLSA; but those whose activities do not affect the safety of operation are not governed by the Motor Carrier Act, and not exempt from the wage and hour provisions of FLSA.

The Court has held that, in view of Congress's determination that safety is paramount, it is the agency's power under the Motor Carrier Act to regulate "qualifications and maximum hours" that determines whether that statute applies, not whether the agency has exercised its power. Id. at 673; Morris v. McComb, 332 U.S. 422, 434 (1947). Accordingly, although the Department of Transportation only regulates the activities of truck drivers, 49 C.F.R.§ 395.3 (1995), because the agency has asserted the power to regulate the activities of certain other employees, i.e., loaders, mechanics, and helpers, those employees are also exempt from FLSA. Levinson, 330 U.S. at 673.

Such employees need not devote all or even the majority of their time to safety-affecting activities in order to be covered by the Motor Carrier Act. Id. at 674. Thus it is enough that a "loader" devote "a `substantial part' of his time to activities affecting safety of opera-

5

tion." Id. at 681. On the other hand, "the mere handling of freight at a terminal, before or after loading, or even the placing of certain articles of freight on a motor carrier truck may form so trivial, casual or occasional a part of an employee's activities, or his activities may relate only to such articles or to such limited handling of them, that his activities will not come within the kind of 'loading' which is described by the Commission and which, in its opinion, affects safety of operation." Pyramid Motor Freight Corp. v. Ispass, 330 U.S. 695, 708 (1947).

III.

Stavola's principal argument on appeal is that a court must find an employee is covered by the Motor Carrier Act, and so exempt from the FLSA, if he is "a member of a class of employees that regularly engaged in activities that affected the safety of interstate transportation." Brief for Appellant at 8 (emphasis added). Stavola maintains that the district court erred in focusing on Troutt's actual activities -- that he, in fact, only secured items in the transporter twice during more than three years. Stavola asserts that no matter how minor or peripheral Troutt's actual loading activities were, he was a member of the class of "loaders" and so automatically covered by the Motor Carrier Act.

Stavola's argument fails because its analysis is incomplete. Stavola is correct that an employee's class of work plays an important role in the determination. This is so because the Secretary of Transportation's -- and prior to the Secretary, the I.C.C.'s-- jurisdiction comprises only certain classes of motor carrier employees -- truck drivers, loaders, mechanics, and helpers; only if an employee falls within one of these classes does the Motor Carrier Act govern him. Pyramid, 330 U.S. at 706-07 ("The Commission has defined its jurisdiction, both affirmatively and negatively, as follows . . . . `we have power . . . to establish qualifications and maximum hours of service for . . . mechanics, loaders and helpers . . . and .. . we have no such power over any other classes of employees, except drivers.'") (quoting Ex Parte No. MC-2, 28 M.C.C. 125, 139 (1941)). Recognizing the agency's authority to determine what classifications of work affect safety of operation of motor carriers, the Supreme Court has clearly

6

accepted these classifications. See Levinson, 330 U.S. at 669; Pyramid, 330 U.S. at 707.**1**

But what Stavola ignores is that the Supreme Court has been equally clear that when there is a factual question as to whether a particular employee is within one of these covered classifications that question is decided in the judicial process and on an individual basis. Thus, in Pyramid, after noting that the I.C.C. had "done its work" by "defin[ing] its jurisdiction" in establishing the above classifications, the Supreme Court remanded the case for the district court to determine whether "the activities of each respondent, either as a whole or in substantial part, come within the Commission's definition of the work of a `loader.'" 330 U.S. at 706-07 (emphasis added).

The Supreme Court further instructed that "the District Court shall

_____

**1** In defining its jurisdiction the I.C.C. briefly described the work of loaders as those "whose sole duties are to load and unload motor vehicles and transfer freight between motor vehicles and between the vehicles and the warehouse." MC-2, 28 M.C.C. at 134. In Levinson and Pyramid, the Supreme Court elaborated on this description. Levinson, 330 U.S. at 652 n.2, 674-75; Pyramid, 330 U.S. at 698-708. Apparently, this description, as explained by the Court in Levinson and Pyramid, is the only definition of the work of loaders ever adopted by the I.C.C. or Secretary of Transportation. However, the Wage and Hour Division of the Department of Labor has issued an interpretative bulletin, defining the work of a "loader," which incorporates and expands on this definition. See 29 C.F.R. 782.5 (1995). Both parties seek to rely on this interpretative bulletin. However, in Levinson the Supreme Court specifically noted that the "unique provisions" of the motor carrier exemption to the FLSA meant that the court was: "not dealing with an exception to that Act which is to be measured by regulations which Congress has authorized to be made by the Administrator of the Wage and Hour Division, United States Department of Labor. Instead, we are dealing here with the interpretation of the scope of the safety program of the Interstate Commerce Commission, under § 204 of the Motor Carrier Act, which in turn is to be interpreted in the light of the regulations made by the Interstate Commerce Commission pursuant to that Act." Levinson , 330 U.S. at 676-77 (emphasis in original) (footnote omitted). Accordingly, although we note that the Wage and Hour Division's interpretative bulletin supports the district court's analysis and holding, we give no weight to the bulletin.

7

not be concluded by the name which may have been given to [an employee's] position," but "shall give particular attention to whether or not the activities of the respective respondents included that kind of `loading' which is held by the Commission to affect safety of operation." Id. at 707-08. The Pyramid Court then cautioned that some loading activities are so "limited" or may form so "trivial, casual or occasional a part of an employee's activities" that they "will not come within the kind of `loading' which is described by the Commission and which, in its opinion, affects safety of operation." Id. at 708. Finally, the Court concluded that if the district court should determine that the "alleged `loading' activities of the respective respondents" do not fall within the kind of work the Commission has determined affect safety of operation, then "those respondents . . . are entitled to the benefits of § 7 of the Fair Labor Standards Act." Id. Thus, rather than error as Stavola suggests, the district court's focus on Troutt's individual activities to determine if they were the "kind of `loading' which is held by [the Secretary of Transportation] to affect safety of operation" is the precise inquiry mandated by the Supreme Court in Pyramid. 330 U.S. at 708.

Morris v. McComb, 332 U.S. at 434, is not to the contrary. Unlike Pyramid, Levinson, American Trucking , and the case at hand, the principal issue in Morris was not whether an employee's activities affected safety of operation, but the very different question of whether the motor carrier provided transportation in interstate commerce.[2] Morris held that a motor carrier, which conducted only 4% of its business in interstate commerce but which was required, by "virtue of that status" as a licensed carrier to accept interstate business, was covered by the Motor Carrier Act. Morris, 332 U.S. at 434. All of the carrier's "drivers and these `mechanics' whose work affect[ed] the safety of transportation," who were concededly employed full time as such and who "shared indiscriminately" interstate assignments, were held covered by the Motor Carrier Act, even though two of the drivers in a given year performed all of their work in intrastate commerce. Id. at 431, 433. Accord Griffin v. Consolidated Foods Corp., 771 F.2d 826

_____

[2] It is undisputed that Stavola is a "motor private carrier" that provides transportation on public highways between two states. 49 U.S.C.A. § 13102(13) and § 13501 (West 1997).

8

(4th Cir. 1985); Brennan v. Schwerman Trucking Co., 540 F.2d 1200 (4th Cir. 1976).

Contrary to Stavola's suggestion, Morris did not thereby overrule Pyramid's command (issued only a few months earlier), that in determining if an employee's work affected the "safety of operation" a court is to examine the work of the individual employee or Pyramid's directive that an individual employee's loading activities may be so "limited," "trivial," "casual," or"occasional" as to be de minimis and so not affect "safety of operation." 330 U.S. at 708.[3] In Morris, it was conceded that the work of those held covered by the Motor Carrier Act and exempt from FLSA -- truck drivers and certain mechanics who worked full time as such -- affected "the safety of transportation." 332 U.S. at 431.

Indeed, to the extent Morris considered the safety issue, it followed the same approach articulated in Pyramid. Noting that "nothing in the record [showed] the extent to which the respective garagemen and laborers devoted themselves to" the kinds of work which affected safety, the Morris court observed that if this were a case "to recover overtime for individual employees, it would be necessary to determine that fact." 332 U.S. at 430. In other words, when an individual employee claims overtime pay, as in the case at hand, the Morris

_____

[3] In the fifty years since Morris and Pyramid were issued, no court has held Morris overruled Pyramid. Rather, we and several of our sister circuits have expressly recognized that Pyramid remains good law. See, e.g., Blankenship v. Thurston Motor Lines, Inc., 415 F.2d 1193, 1196 (4th Cir. 1969) (Pyramid "demonstrate[s] the application of the de minimis rule, that is, that I.C.C. jurisdiction would not attach if an employee's activities directly related to the safety of interstate vehicles were trivial in relation to his overall duties."); Friedrich v. U.S. Computer Services, 974 F.2d 409, 416 (3rd Cir. 1992) (citing Pyramid in observing that "[t]he Supreme Court has recognized a de minimis exception to the application of the MCA"); Crooker v. Sexton Motors, Inc., 469 F.2d 206, 209 (1st Cir. 1972) (adopting a construction of the Motor Carrier exemption which "is not contrary to Pyramid"); Yellow Transit Freight Lines, Inc. v. Balven, 320 F.2d 495, 498 (8th Cir. 1963) (quoting Pyramid's language that the district court should focus on whether an employee's activities "included that kind of loading' which is held by the Commission to affect safety of operation.").

9

Court recognized that it was "necessary to determine" the facts as to the employee's duties in order to decide if they fall within one of the classifications of work covered by the Motor Carrier Act. Not only did Morris thus follow the Pyramid approach, it also reaffirmed the Pyramid holding that if an employee's individual duties are found not to be within a defined Motor Carrier Act classification, the employee is entitled to the benefits of FLSA. Thus, Morris expressly approved the issuance of an injunction "against violation of § 7 of the Fair Labor Standards Act . . . to those garagemen and laborers who are not `mechanics' as defined by the Interstate Commerce Commission." 332 U.S. at 430.

In sum, the district court did not commit any legal error in focusing upon Troutt's actual loading activities.

IV.

Stavola's only remaining challenge is to two portions of the district court's factual findings with respect to the nature of Troutt's actual loading activities.

The district court found:

> [T]he only activity involving the securing of equipment by Plaintiff proven by a preponderance of the evidence is that Plaintiff on two occasions chocked down the wheels of race cars inside the transporter. This activity falls within the "de minimus" [sic] exception discussed by the Supreme Court in Pyramid Motor Freight. The evidence established that the chocks are only a preliminary securing device, to be used in conjunction with the nylon straps to secure the car inside the transporter. No evidence establishes that Plaintiff ever secured the nylon straps around the wheels of the cars, or in any other way secured any other item inside the transporter. Furthermore, Plaintiff secured chocks only two times during the approximate three year span he was employed by Defendant.

Troutt, 905 F. Supp. at 300.

Stavola does not assert that the district court's critical finding that Troutt only chocked down the wheels twice in a three year span is

10

clearly erroneous. The company does claim that the district court erred with regard to its finding as to the evidence as to Troutt's securing of "any other item inside the transporter." Brief for Appellant at 22. Stavola asserts that because a company witness testified that Troutt did secure other items, it was error to conclude that there was "no evidence" of this. Stavola misreads the district court's finding. The court did not find that no evidence "exists" as to whether Troutt secured other items but rather, that no evidence "establishes" this fact; the district court had twice expressly explained that the company had not established this fact "by a preponderance of the evidence." Troutt, 905 F. Supp. at 299, 300. The record supports this finding.

Stavola's remaining attack on the district court's factual findings concerns the nature of the chocks. The company maintains that no evidence supports the district court's finding that the chocks are "a preliminary securing device." In this instance, Stavola misreads the record. The truck driver himself testified:

> [Y]ou had wheel chocks that went under the wheels that you placed in a certain spot. . . . -- the ones we used were metal, and they were bolted down. Once you placed them where they went, a bolt held them to the floor. Then, there is what we call ratchet straps. It's something like a cargo strap. You take four straps per car and strap the car to the floor also, so it can't move in case the chock moves.

From this testimony, a factfinder could conclude that chocks were, indeed, a "preliminary securing device." Thus, there was no error. Moreover, even if the evidence did demonstrate that the chocks constituted more than a "preliminary securing device," our holding would remain unchanged; Troutt's use of the chocks on two occasions in more than three years of employment clearly falls within Pyramid's "de minimis" exception.

V.

The district court neither employed an improper legal analysis nor made erroneous factual findings in concluding that Troutt was covered by FLSA. Accordingly, the judgment of the district court is

AFFIRMED.