Leslie F. ROGERS et al.

v.

**SAVINGS FIRST MORTGAGE, LLC et al.**

No. CIV.A. WMN–03–2984.

United States District Court, D. Maryland.

March 16, 2005.

Bradford W. Warbasse, Baltimore, MD, for Leslie F. Rogers et al.

David A. Seltzer, Wilson Elser Moskowitz Edelman and Dicker LLP, Washington, DC, for Savings First Mortgage, LLC et al.

## MEMORANDUM

NICKERSON, Senior District Judge.

Before the Court are cross motions for partial summary judgment. Paper Nos. 44 (Plaintiffs') and 46 (Defendants'). The motions are fully briefed. Upon a review of the motions and the applicable case law

the Court determines that no hearing is necessary (Local Rule 105.6) and that Plaintiffs' motion will be granted and Defendants' denied.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs[1] were formerly employed as loan officers for Defendant Savings First Mortgage, LLC (SFM). They bring this action seeking additional compensation under the federal Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201 *et seq.* (FLSA), and under the Maryland Wage Payment and Collection Law, Md.Code Ann., Lab. & Empl. §§ 3–501 *et seq.* (Wage Payment Law). In addition to SFM, Plaintiffs have named Harry Korotki as a Defendant. Mr. Korotki is the president and sole owner of SFM.[2]

Defendant SFM is a residential mortgage company. During the period September 1, 1999, through July 31, 2004, SFM employed more than 680 loan officers who used company-supplied leads to solicit homeowners interested in refinancing their home mortgages. Loan officers' duties include: performing mortgage surveys and evaluations; evaluating credit and developing loan proposals; presenting the proposals to the potential borrowers; preparing loan application documents and obtaining necessary pre-approvals; meeting with the borrowers to complete the application process; communicating settlement details; and arranging the loan closing. Once the application packet is completed and signed, the loan file is turned over to a separate processing department to process the loan and handle the file through closing.

Under SFM's compensation agreement, loan officers received no salary or hourly wage. The principal compensation paid to a SFM loan officer was the commissions on loans originated by that loan officer.[3] Payment of those commissions was made on a bi-monthly basis, but commissions were only paid on loans that had gone to closing. Loan officers also all signed a "Restrictive Covenant and Non–Disclosure Agreement" that provided that if his or her employment was terminated, whether voluntarily or involuntarily, no commissions would be paid on loans that closed after the date of termination.

In addition to commissions, loan officers could also earn "year-end" bonuses. Year-end bonuses were calculated based upon the profit that a loan officer generated in the given calendar year. Those bonuses were not paid, however, until June 30th of the following calendar year. If the loan officer was not still employed as of that date, "for any reason whatsoever, whether termination from employment is/was voluntary or involuntary," the year end bonus would be forfeited in its entirety. *See* Defs.' Exh. 11, "2003 Loan Officer Bonus Program." Finally, loan officers could be eligible for a bonus for referring someone to the company who became a loan officer.

---

1. This action was initially filed by Leslie F. Rogers as the sole plaintiff. The Complaint has been amended twice to add thirty-eight additional Plaintiffs, but Plaintiffs have subsequently stipulated to the dismissal of eight of those individuals. Thus, there are currently thirty-one Plaintiffs remaining in this action.

2. The Second Amended Complaint also added as defendants four additional individuals who were SFM officers or managers during the relevant time period. Plaintiffs subsequently stipulated to the dismissal of these additional defendants.

Defendants initially asserted counterclaims against some of the Plaintiffs but those counterclaims have also been voluntarily dismissed.

3. New loan officers had the option of electing to receive a base salary of $375.00 for the first twelve weeks of employment in exchange for a lower commission rate.

These "referral bonuses" equal 5% of the gross profit of fundings that occur in the second, third, and fourth months of the new loan officer's employment.

Plaintiffs allege that very often they were required to work more than 40 hours in a given workweek. They further allege that, for each of the Plaintiffs, there was a large number of pay periods for which they did not receive any compensation at all because no loans closed during that pay period. Several Plaintiffs also complain that, pursuant to the above summarized policies, they were denied commissions on loans that closed after their termination ("terminal commissions"), as well as year-end bonuses that were not paid because they were not still employed on June 30th of the following year. In the Second Amended Complaint, Plaintiffs identify the following categories of compensation and damages to which they assert they are entitled:

— Overtime compensation at 1.5 times the employee's regular rate of pay for those hours worked over 40 per workweek, pursuant to the FLSA (Count I);

— Recovery of underpayments for workweeks where Plaintiffs' wages fell below the federal minimum wage of $5.15 per hour, again pursuant to the FLSA (Count II);

— Liquidated damages under Counts I and II in an amount equal to the backpay awards, as authorized in 29 U.S.C. § 216(b);[4]

— Unpaid commissions and bonuses, pursuant to § 3–501(c)(2)(ii) of the Wage Payment Law, along with treble dam-

ages and attorneys' fees and costs under § 3–507.1(b) (Count IV).

Each of these categories of damages is the subject of the summary judgment motion filed by Plaintiffs or Defendants, or as to some categories, both.

## II. SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to summary judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). For purposes of summary judgment, a dispute about a fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if, when applied to the substantive law, it affects the outcome of litigation. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

A party seeking summary judgment bears the initial responsibility of informing the court of the basis of its motion and identifying the portions of the opposing party's case which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When considering the motion, the court assumes that all of the non-moving party's evidence is worthy of belief and justifiable inferences are drawn in favor of the non-moving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d

---

**4.** In Count III of the Second Amended Complaint, Plaintiffs sought damages equal to three times the overtime and minimum wage underpayments from Counts I and II, along with attorneys' fees and costs pursuant to § 3–507.1(b) of the Wage Payment Law.

Plaintiffs have stipulated that they are not entitled to treble damages in connection with their minimum wage and overtime claims and accordingly, it is appropriate that Count III be dismissed.

538 (1986). If the movant demonstrates that there is no genuine issue of material fact and that she is entitled to summary judgment as a matter of law, the non-moving party must, in order to withstand the motion for summary judgment, produce sufficient evidence in the form of depositions, affidavits or other documentation that demonstrates that a triable issue of fact exists for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment. Instead, the evidentiary materials must show facts from which the finder of fact could reasonably find for the non-moving party. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. At the summary judgment phase, it is not appropriate for the court to make credibility determinations, weigh the evidence, or draw inferences from the facts which are adverse to the nonmoving party; these are jury functions. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

## III. DISCUSSION

### A. Fair Labor Standards Act Claims

█ Congress's goal in enacting the FLSA was "to protect all covered workers from substandard wages and oppressive working hours, 'labor conditions [that are] detrimental to the maintenance of the minimum standard of living necessary for health, efficiency and general well-being of workers.'" *Barrentine v. Arkansas–Best Freight System, Inc.,* 450 U.S. 728, 739, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981) (quoting 29 U.S.C. § 202(a)). Section 206 provides that covered employees shall be paid not less than $5.15 per hour. 29 U.S.C. § 206(a)(1). Section 207 provides that covered employees who work more than 40 hours in a workweek shall be paid at least one and one-half times their regular pay rate for those hours worked above 40 hours. 29 U.S.C. § 207(a)(1). In inter-

preting the FLSA, the Supreme Court has frequently emphasized the nonwaivable nature of an individual employee's right to a minimum wage and to overtime pay under the Act. "FLSA rights cannot be abridged by contract or otherwise waived because this would 'nullify the purposes' of the statute and thwart the legislative policies it was designed to effectuate." *Id.* at 740, 101 S.Ct. 1437 (*citing Brooklyn Savings Bank v. O'Neil,* 324 U.S. 697, 707, 65 S.Ct. 895, 89 L.Ed. 1296 (1945)).

### 1. Minimum Wage Claims

Twenty-nine Plaintiffs have moved for summary judgment on their minimum wage claims seeking entry of judgment in the aggregate amount of $97,430.60. The two remaining Plaintiffs, Leslie Rogers and Andrea Mack, while acknowledging that a dispute as to the number of hours that they worked prevents entry of judgment on their minimum wage claims at this time, nonetheless seek a declaration that they were entitled to have been paid at the minimum wage. Plaintiffs concede that the amount of underpayment as to Rogers and Mack would need to be determined at trial.

The FLSA's minimum wage obligations extend to employers who employ workers in an "enterprise engaged in [interstate] commerce or in the production of goods for commerce ... whose annual gross volume of sales made or business done is not less than $500,000." 29 U.S.C. § 203(s)(1)(A)(ii). The term "employer" includes "any person acting directly or indirectly in the interest of an employer in relation to an employee." *Id.* at 203(d). SFM admits that it engages in interstate commerce and has a business volume exceeding $500,000. For the purposes of this lawsuit, Defendants have stipulated that Korotki, as the sole owner of SFM and with operational control of the compa-

ny as its sole corporate officer is an "employer" within the meaning of the FLSA. Furthermore, the parties have been able to agree by stipulation or admission as to the hours worked by all Plaintiffs except Rogers and Mack, and it is on these agreed-upon hours that Plaintiffs base their claim for the aggregate amount of $97,430.60 in minimum wage claims. As to Plaintiffs' minimum wage claims, the dispute is not about whether Plaintiffs are entitled to have been paid pursuant to the minimum wage statute, but centers on how those minimum wage payments are to be calculated.

Defendants' method of calculation relies on two related propositions, both of which this Court finds untenable. First, Defendants argue that Plaintiffs fall under an "interstate transportation" or "motor carrier" exemption to the FLSA's overtime provisions and that Defendants should be permitted to selectively invoke that exemption as to any Plaintiff of their choosing. For the reasons stated in the next section of this opinion, the Court finds that the motor carrier exemption is inapplicable to Plaintiffs. Defendants' second proposition, which the Court also finds unsupportable, is that Defendants should be allowed, at least as to some Plaintiffs, to stretch the allocation of commissions over the average period of time that Defendants contend it takes to process a loan.

Defendants' first proposition relating to the entitlement to overtime pay is only raised in this discussion of minimum wage pay because it is Defendants' belief that the methodology of allocating commissions can vary depending upon whether the allocation is for minimum wage purposes only, for overtime purposes only, or for both overtime and minimum wage purposes. Defendants acknowledge, as they must, that if only minimum wage payments are at issue, the wages paid on a prescribed payday must be allocated to the workweeks within that pay period where the pay period is greater than a week. For overtime purposes, however, Defendants argue that commissions can be allocated to the period in which the commission is *earned*. In this instance, they would argue that this period is the average time from the date a loan is originated to the date that it is closed, which Defendants represent to be 51 days. Defendants further assert that when commissions must be allocated for purposes of both minimum wage and overtime, this can also be done over this 51 day period.[5]

Plaintiffs, in contrast, contend that a commission payment can only be allocated over the semi-monthly pay period in which it is received. In their view, the commission must be pro-rated to each day within that pay period, and then the compensation allocated to each day is attributed to the workweek in which it falls. Plaintiffs protest that, contrary to Defendants' mischaracterization of their position, they are not advocating that commissions be allocated only to the single workweek in which there are paid. Because the semi-monthly pay period (of 15 or 16 days) will typically span three workweeks, under Plaintiffs' methodology a single commission might

---

**5.** Defendants assert that while the motor carrier exemption is potentially available as to all loan officers, it should be applied only to those employees to which Defendants choose to apply it. Thus, they posit a methodology under which they could allocate commissions paid to each individual Plaintiff either to semi-monthly pay periods or to 51–day pay periods. Presumably, Defendants would make this election based upon which calculation would be to Defendants' economic advantage. Because the Court finds that the exemption is not applicable to any Plaintiff, it need not decide whether Defendants would be empowered with such unfettered discretion were the exemption available.

satisfy the minimum wage obligation for three separate work weeks.

■ The Court finds Plaintiffs' methodology to be more consistent with the principles of the FLSA. The FLSA "takes as its standard a single workweek consisting of seven consecutive days." *Roland Electric Co. v. Black*, 163 F.2d 417, 421 (4th Cir.1947), *cert. denied*, 333 U.S. 854, 68 S.Ct. 729, 92 L.Ed. 1135 (1948). "While there is no requirement that compensation be paid weekly, the minimum wage provisions of the [FLSA] apply on a workweek basis. Thus, in order to meet the requirements of [the FLSA's minimum wage provisions], an employee compensated wholly or in part on a commission basis must be paid an amount not less than the statutory minimum wage for all hours worked in each workweek without regard to his sales productivity." *Marshall v. Allen–Russell Ford. Inc.*, 488 F.Supp. 615, 617 (E.D.Tenn.1980). Furthermore, "this amount must be paid to him free and clear (i.e. finally and unconditionally) *on the payday for that week.*" *Id.* at 617–18 (emphasis added); *see also Roland Electric*, 163 F.2d at 421 (holding a claim for unpaid wages under the FLSA arises immediately upon the employer's failure to pay, on the regular pay day, all wages which are due).

This last requirement reflects Congressional awareness that the timely payment of compensation can be critical for lower wage workers. In the context of explaining the inclusion of a liquidated damages provision in the FLSA, the Supreme Court observed,

> the liquidated damage provision is not penal in its nature but constitutes compensation for the retention of a workman's pay which might result in damages too obscure and difficult of proof for estimate other than by liquidated damages. It constitutes a Congressional recognition that failure to pay the statutory minimum on time may be so detrimental to maintenance of the minimum standard of living "necessary for health, efficiency, and general well-being of workers" and to the free flow of commerce, that double payment must be made in the event of delay in order to insure restoration of the worker to the minimum standard of well-being. Employees receiving less than the statutory minimum are not likely to have sufficient resources to maintain their well-being and efficiency until such sums are paid at a future date.

*Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707–08, 65 S.Ct. 895, 89 L.Ed. 1296 (1945). *See also Marshall v. Sam Dell's Dodge Corp.*, 451 F.Supp. 294, 302 (N.D.N.Y.1978) (noting "even the better paid salesman with a family would be hard pressed if he was obliged to suffer a few weeks at less than minimum wages").

■ Here, it is undisputed that Defendants established a semi-monthly pay period. While Defendants are correct "that the FLSA does not require that an employer utilize a pay period of any specific duration," Defs.' Reply at 15, the cases are clear that, once a pay period is established, it cannot be retroactively modified to escape FLSA liability. For example, in *Sam Dell's Dodge*, the defendant, a car dealership, paid its salespersons a minimal base salary on a weekly basis. This base salary was augmented by commissions and often substantial weekly, monthly, and annual bonuses. Because the employees received less than the minimum wage for the weeks where they were paid only the base pay, but substantially more for weeks involving commissions and bonus, the defendants contended that "some period other than the week should be used in assessing compliance with the minimum wage requirements of the [FLSA]." 451 F.Supp. at 301. Specifically, they argued for what

would be in effect a yearly, or in the alternative, a monthly pay period. *See id.* The court rejected that suggestion, observing that as salespersons were paid each week for earning which accrued during that week, there is no problem fixing the work period as one week. "Having established the week as the applicable pay period, defendants cannot now argue that any other time period measures compliance with the [FLSA]." *Id.*

The sole authority cited in Defendants' pleading for their position that the minimum wage can be calculated differently where overtime is also at issue is the deposition and report of their expert witness, Travis Campbell. Campbell, in turn cites portions of the Department of Labor's Field Operations Handbook (FOH) and the Code of Federal Regulations. Campbell admits, however, that he is not aware of any court that has ever applied this alternative methodology to calculate minimum wage payments simply because the plaintiffs were also pursuing overtime claims. Campbell Dep. at 21. Defendants have not directed the Court to any such decision and the Court's exhaustive research has uncovered none. Furthermore, Campbell admits that he has no idea why the presence or absence of an overtime exemption should impact the way in which minimum wages are calculated under the FLSA. *Id.*

Defendants are somewhat vague as to which regulations or portions of the FOH they are advocating the Court should apply. In their pleadings, Defendants opine

what "DOL policy" prescribes or permits without ever citing to any particular portion of the Code or FOH. *See* Defs.' Reply at 16. Defendants' pleadings actually quote "DOL policy," but again without specific citation. *Id.* (stating without citation that their "approach is consistent with DOL policy as it is 'reasonable and equitable' ").

Subchapter 30b of the FOH discusses the methods to be used to determine compliance with the minimum wage requirements of the FLSA. Section 30b05 within that subchapter addresses "Employee[s] compensated on a commission basis." Because methods of computation and payment involving commissions vary widely, the FOH instructs that "the determination of [minimum wage/overtime] compliance must be made on the facts of each case." FOH § 30b05(a). The Handbook does allow that some general principles may be applicable. *Id.*

"If an employee paid wholly or in part on a commission basis is subject to [overtime]," the FOH states that "the principles set out in [29 C.F.R.] 778.117–778.122 shall be followed." FOH § 30b05(b).[6] These sections of the Code give guidance as to the calculation of the "regular rate" for overtime purposes where the employee is paid by commission. The only regulations in this portion of the Code that could arguably apply here are §§ 778.119 ("Deferred commission payments—general rules") and 778.120 ("Deferred commission

---

**6.** As mentioned above, Defendants' expert does cite some provisions of the FOH and Code of Regulations in his report and deposition, but his reasons for citing these particular provisions are not clear. When he looks for guidance as to the method for calculating minimum wages for employees who are exempt from overtime, he properly goes to Subsection 30b05(c). *See* Campbell Report at unnumbered page 3. This subsection explicitly states that it is to be used in determining

whether an employee is paid in compliance with minimum wage requirements "[i]f an employee paid on a commission basis is exempt from [overtime]." But for reasons he does not explain, when addressing employees paid commission but not exempt from overtime, he directs the Court's attention to provisions related to "bonus[es] and other payments," FOH § 30b07(b), and ignores § 30b05(b). *See id.* at unnumbered page 4.

payments not identifiable as earned in particular workweeks"). The thrust of § 778.119 is that, in situations where the calculation and payment of the commission cannot be completed until after the regular pay day, the employer can disregard the commission in determining the regular pay rate until the amount of the commission can be ascertained. Once the amount can be ascertained, it must be "apportioned back over the workweeks of the period during which it was earned." Section 778.120 addresses the situation where "it is not possible or practicable to allocate the commission among the workweeks of the period in proportion to the amount of commission actually earned or reasonably presumed to be earned each week." In that instance, "some other reasonable and equitable method must be adopted." 29 C.F.R. § 778.120.

Plaintiffs' proposed method of calculation essentially follows the method suggested in § 778.119; commissions are apportioned over the workweeks encompassed in the semi-monthly pay period in which the commissions were "earned," at least as that term is defined by Defendants. As discussed below in the context of Defendants' request for judgment on Plaintiffs' terminal commission claims, it is Defendants' position that commissions are only earned when a loan closes and funds and a loan officer has earned nothing prior to that date. *See* Defs.' Mot. at 6. In light of Defendants' position, the Court cannot conclude that it is not "possible or practicable to allocate the commission among the workweeks of the period in proportion to the amount of commission actually earned." Thus, whatever principles might be inferred from § 778.120 are not implicated here. Of additional note, regardless of any allocation principles that might be implicated, nothing in any of these regulations can be read to relieve Defendants of the obligation to pay no less than the minimum wage for each workweek within a pay period on that regular payday for that workweek.

For these reasons, the Court concludes that Plaintiffs are entitled to minimum wage payments as calculated and set out in their exhibits.

### 2. Overtime Claims—Applicability of the "Motor Carrier" Exemption

While neither Defendants nor Plaintiffs have moved for summary judgment on Plaintiffs' overtime claims, Defendants have asked that the Court hold that an overtime compensation exemption that applies to employees engaged in the interstate transportation of personal property is applicable to Plaintiffs' claims.

Three years before passing the FLSA, Congress enacted the Motor Carrier Act of 1935(MCA). The purpose of the MCA was to promote efficiency, economy, and safety in the rapidly growing motor transportation industry and, in line with that purpose, the MCA gave the Interstate Commerce Commission (ICC) the authority to regulate the maximum hours of work for employees of "common carriers" and "contract carriers" by motor vehicle. The MCA also gave the ICC similar regulatory powers over employees of "private carriers" by motor vehicle if the ICC concluded that such regulation was needed to promote safety on the nation's roadways. *See Friedrich v. U.S. Computer Services,* 974 F.2d 409, 412 (3rd Cir.1992). These regulatory powers have since been transferred by Congress from the ICC to the Department of Transportation (DOT). *See id.*

When it enacted the FLSA, Congress wanted to ensure that the FLSA's overtime provisions not overlap or interfere with those of the MCA. Accordingly, Congress included a provision in the FLSA

that exempted employees whose hours the ICC had the power to regulate from the FLSA's overtime regulations. This exemption, as amended, is codified at 29 U.S.C. § 213(b)(1) and states, "[t]he provisions of section 207 of this title (the overtime provisions) shall not apply with respect to—(1) any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49 ...."

Section 31502 of the MCA provides that "[t]he Secretary of Transportation may prescribe requirements for—(1) qualifications and maximum hours of service of employees of ... a motor carrier; and (2) qualifications and maximum hours of service of employees of ... a motor private carrier, when needed to promote safety of operation." 49 U.S.C. § 31502(b). A "motor private carrier" is defined under the MCA as

a person, other than a motor carrier, transporting property by motor vehicle when-

(A) the transportation is as provided in section 13501 of this title; [7]

(B) the person is the owner, lessee, or bailee of the property being transported; and

(C) the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise.

49 U.S.C. § 13102(13). Furthermore, for the exemption to be applicable, not only must the employer be a "common carrier," "contract carrier," or "private motor carrier," but the employee must also be one "whose work activities affect the 'safety of operation' of that motor carrier." *Troutt v. Stavola Bros. Inc.*, 107 F.3d 1104, 1107 (4th Cir.1997).

It is Defendants' contention that SFM is a "motor private carrier." Defendants reason as follows. SFM markets its loans in four states: Maryland, Virginia, Pennsylvania, and Delaware. Historically, 50% of its customers are located outside of the state of Maryland. Defendants contend that because the percentage of loans that go to closing is significantly higher when loan officers make an appointment and present the loan package to the borrowers in person instead of simply mailing the package, loan officers regularly travel out of state to meet with potential borrowers. The typical loan package consists of approximately twenty documents that are approximately one-half inch thick. Aff. of David Barrash at ¶ 4. Because loan officers carry this one-half inch thick folder of paper with them when they go to present the loan, Defendants argue that they are "engaged in the transportation of property," Defs.' Mot. at 15, and therefore, SFM is a "motor private carrier" whose employees are exempt from the FLSA's overtime provisions.

■ The Supreme Court has cautioned that exemptions to the FLSA are to be "narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit." *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960); *see also Pugh v. Lindsay*, 206 F.2d 43, 46 (4th Cir.1953)("Since the Act is remedial in nature, the exemptions contained therein must be strictly construed, and it is incumbent upon one asserting an exemption to bring himself clearly and unmistakably within the spirit and the letter of its terms."). The burden of invoking these exemptions rests upon the employer.

---

7. Section 13501 is a general jurisdiction provision and imposes the condition that the transportation at issue must involve interstate or foreign commerce.

*Arnold,* 361 U.S. at 394 n. 11, 80 S.Ct. 453; *Martin v. Malcolm Pirnie, Inc.,* 949 F.2d 611, 614 (2nd Cir.1991), *cert. denied,* 506 U.S. 905, 113 S.Ct. 298, 121 L.Ed.2d 222 (1992). Thus, in order to hold that SFM can rely upon the motor carrier exemption to avoid its obligations to pay overtime wages, this Court must conclude that SFM can meet the burden of establishing that it is plainly and unmistakably a private motor carrier.

■ While Defendants cite close to two dozen cases in their discussion of this exemption, none of those cases find the exemption applicable under circumstances remotely resembling those presented here. Most of the cases address issues not in dispute here. For example, in *Troutt,* the Fourth Circuit specifically noted that, in the case before it, "[i]t is undisputed that (the plaintiff's employer) is a 'private motor carrier' that provides transportation on public highways between two states." 107 F.3d at 1109 n. 2. The issue in *Troutt* was whether the particular employee's activities "affect safety of operations." *Id.* at 1108; *see also Blankenship v. Thurston Motor Lines, Inc.,* 415 F.2d 1193 (4th Cir. 1969) (addressing whether loading dock workers who loaded freight into trucks for interstate carrier had sufficient discretion in the exercise of their duties to affect safety). In several of the cases cited by Defendants, there was an issue as to whether the employer's enterprise had sufficient interstate connections to fall within the exception, but it was undisputed that the employer was otherwise a common or private motor carrier. *See, e.g., Griffin v. Consolidated Foods Corp.,* 771 F.2d 826 (4th Cir.1985) (stating "the sole question on appeal is whether [defendant] was engaged in such interstate commerce as to qualify for the motor carrier exemption" in case involving route salesperson who delivered panty hose from employer's warehouse to retail stores in company owned van); *Garcia v. Pace Suburban Bus Serv.,* 955 F.Supp. 75 (N.D.Ill.1996) (holding that bus driver for common carrier was exempted from FLSA where he "reasonably could be expected to make one of the carrier's interstate runs").

Here, there is no dispute that Plaintiffs are called upon to make frequent trips to other states. It is also undisputed that, were SFM a private motor carrier, Plaintiffs' employment activities, which include more than a *de minimis* amount of driving, could be found to affect safety. The sole issue then is whether SFM is a private motor carrier. That determination, in turn, depends on whether carrying a half inch file of paper constitutes the "transportation of property" under the MCA. As the Supreme Court has observed, once a court concludes that the employer is not a carrier, "it is not necessary to determine which of the employees ... do work which affects the safety of operation of motor vehicles." *Boutell v. Walling,* 327 U.S. 463, 471–72, 66 S.Ct. 631, 90 L.Ed. 786 (1946). If the employer is not a carrier, the inquiry is over and the exemption does not apply.

The only decision cited by Defendants directly addressing the question of whether the employer was a private motor carrier under facts arguably close to those presented here is *Friedrich v. U.S. Computer Serv.,* 974 F.2d 409 (3rd Cir.1992). The plaintiffs in *Friedrich* were field engineers employed by a company that provided computer hardware and software installation, maintenance, and repair service. Although plaintiffs were based in Pennsylvania, they routinely serviced customers in several surrounding states. When a customer was located within a six-hour drive, the field engineers would drive their personal vehicles to the customer's place of business, carrying with them a tool kit,

replacement parts, and other equipment. These field engineers filed an action seeking overtime compensation under the FLSA and the defendant moved for summary judgment, arguing that the plaintiffs were exempted from FLSA's overtime provisions under the interstate transportation exemption.

The district court agreed with the defendant. On appeal, the Third Circuit affirmed the lower court's decision, reasoning that because the plaintiffs carried tools and spare parts, they were transporting property. The Third Circuit reached this conclusion acknowledging that the MCA does not define "property" and that "it is arguable that the tools, parts, and equipment the plaintiffs transported were so trivial or insubstantial that they did not constitute property within the meaning of the MCA." 974 F.2d at 417.

Taking what this Court views as a more reasoned approach, Chief Judge Sloviter authored a dissenting opinion in *Friedrich* in which he concluded that "incidental carriage by plaintiffs" of the tool kit and parts was insufficient to render their employer a private motor carrier. "The absence of enhanced safety concerns due to plaintiffs' transportation of the tool kits and minimal replacement parts makes the MCA inapplicable in that the policy considerations supporting exemption of motor private carriers from the requirement to pay overtime compensation to their drivers is not implicated." *Id.* at 421 (Soloviter, C.J., dissenting).

There is no precedent that is binding on this Court that would compel it to conclude that Plaintiffs were engaged in the transportation of property in interstate commerce. Even *Friedrich* can be readily distinguished on its facts. In *Friedrich,* the plaintiffs were carrying tool kits consisting of approximately 75 tools and weighing 35 pounds, spare parts, and on occasion, a personal computer board or tandem board. As Chief Justice Sloviter opined in his dissent, even under the majority's expansive view of the exemption, had the plaintiff "carried a few diagnostic computer discs with them in order to service customer software instead of a tool kit and a few replacement parts, such 'transportation of property' presumably would not preclude their claim for overtime." *Id.* at 422. A half inch folder of paper is certainly more akin to a few computer disks than to a 35 pound toolkit.

It is possible that under some hypertechnical interpretation of the word "property" one could argue that, contrary to Chief Judge Sloviter's presumption, carrying a onehalf inch file of paper or a few computer disks could be deemed the "transportation of property." Accepting that interpretation, however, would broaden the interstate transportation exemption to include any individuals whose business requires them to routinely drive across state lines, as almost every such employee would invariably be carrying some "property" of his or her employer, be it an invoice, an order form, a business card, a cell phone or a pager. If Congress's intent was to exclude so broad a class of individuals from the FLSA (which it certainly could have done) there is no reasonable basis for it to have drafted the exemption in terms of the "transportation of property."

■ The general rule of statutory construction is that there is no occasion for construction where the language is clear and unambiguous and does not lead to absurd or impracticable results. *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917). There are limits to literalism, however. As the Supreme Court long ago instructed, "[a]ll laws should receive a sensible construction. General terms should be so limited in their

application as not to lead to injustice, oppression, or absurd consequence. It will always, therefore, be presumed that the legislature intended exceptions to its language, which would avoid results of this character. The reason of the law in such cases should prevail over its letter." *United States v. Kirby*, 74 U.S. (7 Wall.) 482, 486–87, 19 L.Ed. 278 (1868).

A noted commentator has similarly observed,

> [t]he literal interpretation of words of an act should not prevail if it creates a result contrary to the apparent intention of the legislature and if the words are sufficiently flexible to admit of a construction which will effectuate the legislative intention. The intention prevails over the letter, and the letter must if possible be read so as to conform to the spirit of the act.... Thus words or clauses may be enlarged or restricted to harmonize with other provisions of an act. The particular inquiry is not what is the abstract force of the words or what they may comprehend, but in what sense were they intended to be understood or what understanding they convey when used in the particular act.

*Sutherland Statutes & Statutory Construction* § 46:7 (6th ed.); *see also In re Sunterra Corp.*, 361 F.3d 257, 265 (4th Cir.2004) (noting that exception to the Plain Meaning Rule exists "when literal application of the statutory language at issue results in an outcome that can truly be characterized as absurd, i.e., that is so gross as to shock the general moral or common sense").

So that the Court is clear, the absurd aspect of Defendants' interpretation of the statute is not that Congress could have intended the exemption to apply to all employees who use their private vehicles to travel over state lines. Congress could have determined that the ICC, and later the DOT, regulate that group of employees. The absurdity is that Congress would have resorted to language related to the transportation of property as the means to define a group that inclusive.

### 3. Liquidated damages claims under the FLSA

■ The FLSA provides that the employer who violates its minimum wage or overtime provisions "shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, *and in an additional equal amount as liquidated damages.*" 29 U.S.C. § 216(b) (emphasis added). As noted above, liquidated damages are not seen as punitive, but as compensation for damages otherwise "too obscure and difficult of proof." *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707–08, 65 S.Ct. 895, 89 L.Ed. 1296 (1945). Under the FLSA, there is a presumption in favor of the award of liquidated double damages against employers who violate the statute. *Lanza v. Sugarland Run Homeowners Assoc., Inc.*, 97 F.Supp.2d 737, 739 n. 9 (E.D.Va.2000).

■ Congress has granted the district courts discretion, however, to withhold liquidated damages under certain limited situations:

> [I]f the employer shows to the satisfaction of the court that the act or omission giving rise to such action was *in good faith* and that *he had reasonable grounds* for believing that his act or omission was not a violation of the [FLSA] the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in [29 U.S.C. § 216(b) ].

29 U.S.C. § 260 (emphasis added). To avoid liquidated damages an employer found liable under section 206 or 207 has the "plain and substantial burden of persuading the court by proof that his failure to obey the statute was *both* in good faith *and* predicated upon such reasonable grounds that it would be unfair to impose upon him more than a compensatory verdict." *Wright v. Carrigg*, 275 F.2d 448, 449 (4th Cir.1960). This burden "is a difficult one to meet ... and '[d]ouble damages are the norm, single damages the exception.'" *Reich v. Southern New England Telecomm. Corp.* 121 F.3d 58, 71 (2nd Cir.1997).

■ In moving for judgment on Plaintiffs' claim for liquidated damages, Defendants raise four main arguments. First, they assert general ignorance of the applicability of the FLSA: "[t]here is no evidence that Defendants knew that Loan Officers had to be paid minimum wage and/or overtime." Defs.' Mot. at 27. Second, they rely on what they represent to be the common practice of other mortgage lenders: "[i]n the personal experience of SFM management, it is customary for employers in the mortgage industry to pay Loan Officers on a straight commission basis." *Id.* Third, Defendants appear to be making a half-hearted "advice of counsel" argument. Korotki testified that when a company he previously owned was acquired by another mortgage company which had it own general counsel, he did not think or could not remember the acquiring company expressing any concerns about the straight commission compensation structure used by the acquired company. Korotki Dep. at 109–10. Fourth, Defendants raise a waiver argument: "Defendants also justifiably believed that Loan Officers were not due overtime and minimum wage because the Loan Officers had voluntarily agreed to be paid on a straight commission basis." Mot. at 28.

Recognizing, as they must, that there can be no waiver of rights under the FLSA, Defendants augment their waiver argument with an "ignorance-of-the-law" argument: "Defendants were unaware that an employee's entitlement to minimum wage and overtime cannot be waived as a matter of law." *Id.*

■ None of these arguments meet Defendants' substantial burden. With the exception of the advice-of-counsel argument, Defendants' arguments carry no legal validity. Courts have consistently held that ignorance of the FLSA's requirements is not a defense to liquidated damages:

> [T]he presumption of willfulness stands, absent positive and compelling proof of good faith. It is not enough, for instance, to plead and prove ignorance of the wage requirements. Knowledge will generally be imputed to the offending employer .... Nor does the complete ignorance of the possible applicability of the [FLSA] shield the employer from liability for liquidated damages.... Good faith requires some duty to investigate potential liability under the [FLSA].

*Reeves v. Int'l Tel. & Tel., Corp.*, 616 F.2d 1342 (5th Cir.1980), *cert. denied*, 449 U.S. 1077, 101 S.Ct. 857, 66 L.Ed.2d 800 (1981). "Nor is good faith demonstrated by the absence of complaints on the part of employees, or simple conformity with industry-wide practice." *Reich*, 121 F.3d at 71 (citations omitted).

If factually supported, a defense based on advice of counsel might be sufficient to avoid liability for liquidated damages. *See Van Dyke v. Bluefield Gas Co.*, 210 F.2d 620, 621 (4th Cir.) (finding it within district court's discretion to deny liquidated damages where an attorney advised employer that plaintiff was not employee covered

under the FLSA), *cert. denied,* 347 U.S. 1014, 74 S.Ct. 870, 98 L.Ed. 1137 (1954). Here, there is no such factual support. When asked about Korotki's testimony concerning the general counsel for that acquiring company, Defendants clarify that they are not representing that Korotki had "any specific conversations relative to wage and hour matters/subjects." Pls.' Exh. G, Email from Defs.' counsel to Pls.' counsel dated Sept. 24, 2004. Korotki does not even remember the attorney's name. *Id.*

Defendants explicitly acknowledge that none of these arguments, standing alone, can satisfy their burden of showing that they acted in good faith with a reasonable belief that they were in compliance with the FLSA. Defs.' Reply at 18. Instead, urging a "totality of circumstances" approach, they hope that four arguments with little or no weight can somehow tip the scale when all are piled on top of one another. *Id.; see also* Defs.' Mot. at 26. The Court finds that the cases cited by Defendants in support of this approach are readily distinguishable. In some of the cases cited, the plaintiffs entitlement to recovery under the FLSA turned on the interpretation of some unsettled or confusing point of law. *See, e.g., Colunga v. Young,* 722 F.Supp. 1479 (W.D.Mich.1989) (declining to award liquidated damages "[i]n light of the complex and conflicting case law defining who is an 'employee' under the FLSA"); [8] *Bowman v. Harford County, Maryland,* 684 F.Supp. 416 (D.Md.1988) (limiting liquidated damage award where defendants reasonably relied on language in county legislation creating the compensation at issue that expressly stated that this compensation would not increase the "established rates of pay").

Other courts denied liquidated damages based on the uncertainty of the factual predicate for the plaintiffs' claim. *Foster v. Irwin,* 258 F.Supp. 709, 712 (D.La.1966) (liquidated damages denied where court was "of the opinion that if proper time records had been kept, the defendant might well have been able to prove that the plaintiffs were not, in fact, underpaid at all.")

Here, Defendants offer no legal argument that they were not required to pay Plaintiffs minimum wage. As for the Motor Carrier Exemption argument advanced in this litigation to avoid the payment of overtime, Defendants make no representation that they were even aware of the potential applicability of this exemption at the time they denied overtime payments. The Court also notes that as of the date of Korotki's deposition, almost one year after this action was filed, Defendants had still not changed their payroll practices to bring them into compliance with the FLSA's minimum wage requirements. *See* Korotki Dep. at 80–82.

The Court finds that under the undisputed facts presented here, Plaintiffs are entitled to liquidated damages in an amount equal to the awards for minimum wage and overtime payments.

### B. Maryland Wage Payment and Collection Law Claims

Under § 3–505 of the Wage Payment Law, employers are required to pay employees "all wages due for work that the employee performed before the termination of employment, on or before the day on which the employee would have been paid the wages if the employment had not been terminated." Md.Code Ann., Lab. & Empl. § 3–505. "Wages" are de-

---

**8.** Another decision from this same district deemed the *Colunga* decision "especially unreliable precedent" because of the circumstances under which it was litigated. *Salazar v. Brown,* 940 F.Supp. 160, 165 (W.D.Mich. 1996).

fined under the Wage Payment Law as "all compensation that is due to an employee for employment" and are defined so as to include "a bonus" or "a commission." *Id.* § 3–501(c)(1) & (2). Section 3–507.1(a) provides the employee a civil cause of action to recover wages withheld in violation of § 3–505. In addition, § 3–507.1(b) provides that "[i]f, in an action under subsection (a) of this section, a court finds that an employer withheld the wage of an employee in violation of this subtitle and not as a result of a bona fide dispute, the court may award the employee an amount not exceeding 3 times the wage, and reasonable counsel fees and other costs."

There are three categories of wages, along with treble damages, that Plaintiffs seek under the Wage Payment Law: (1) "year-end" bonuses, (2) terminal commissions, and, (3) a referral bonus for Plaintiff Robert Greveris.

### 1. Year–End Bonuses

Twenty-seven Plaintiffs seek summary judgment in the aggregate amount of $74,427.87 for unpaid year-end bonuses for calendar years 2002 and 2003. Plaintiffs contend that these Plaintiffs had done everything necessary to earn the bonuses at issue, that the loans upon which the bonuses were based all went to closing, and that Defendants have received the loan profits, a portion of which was promised to these Plaintiffs under SFM's bonus plan. It is undisputed that the only reason these bonuses were not paid is because the Plaintiffs were not employed on June 30th of the year following the calendar year in which these loans were closed. Plaintiffs assert that denying the bonuses on this ground, while perhaps permissible under the terms of SFM's Bonus Plan, is inconsistent with the public policy manifested in § 3–505. Plaintiffs find support for this position in a relatively recent decision of

the Maryland Court of Appeals, *Medex v. McCabe,* 372 Md. 28, 811 A.2d 297 (2002).

Defendants raise two defenses to Plaintiffs' claim for unpaid year-end bonuses. First, they contend that many of the claims are barred by the Statute of Frauds. Second, they argue that the requirement that loan officers be still employed on June 30th of the following year is a legitimate and enforceable durational requirement. They cast this provision as simply a means to combat the high turnover rate in the industry. They postulate that if a loan officer continues to render service for the first six months of the year in order to receive the bonus from the previous year, she might have a sufficient number of loans closed or in progress to induce her to remain in SFM's employ. Defendants find support for their position in *Whiting–Turner Contracting v. Fitzpatrick,* 366 Md. 295, 783 A.2d 667 (2001), a Maryland Court of Appeals decision issued one year before *Medex.*

Like their attempted reliance on a motor carrier exemption, Defendants' invocation of a Statute of Frauds defense, while creative, is ultimately meritless. Defendants base their Statute of Frauds defense on the fact that SFM's bonus plan is only presented to loan officers for signature when they first begin employment. For example, if a loan officer begins work in calendar year 2002, he would be presented with a document entitled "2002 Loan Officer Bonus Program," which states that it covers "loans that fund between the January 1 and December 2, 2002, funding periods." Defs.' Exh. 10. Although SFM would prepare and present a document entitled "2003 Loan Officer Bonus Program" to each new loan officer hired in 2003, loan officers employed in previous years would not be asked to sign this new document. Noting this practice, Defendants contend that after the first year of

employment, "any alleged annual bonus entitlement is based upon an implied in fact or oral contract." Defs.' Mot. at 19. It is undisputed, however, that the terms of the bonus program have been identical for each year since SFM initiated the program.

Maryland's Statute of Frauds provides that:

[u]nless a contract or agreement upon which an action is brought, or some memorandum or note of it, is in writing and signed by the party to be charged or another person lawfully authorized by that party, an action may not be brought:

. . .

(3) On any agreement that is not to be performed within 1 year from the making of the agreement.

Md.Code Ann., Cts. & Jud. Proc. § 5–901. Because they contend that the bonus is paid not only for the loan production for a given year but also for the services rendered for the first six months of the following year, Defendants claim that the contract cannot be fully performed in a year and thus falls under the statute. Thus, the "implied in fact" contracts under which loan officers worked after the initial year of employ are, in Defendants' view, unenforceable.

■ Accepting for the purpose of this discussion Defendants' construction of the bonus agreements, the Court still finds no bar under the Statute of Frauds. Maryland courts have long held that admissions in the form of sworn testimony in court or in deposition can satisfy the statute. *Lewis v. Hughes,* 276 Md. 247, 346 A.2d 231 (1975); *see also Labrecque v. Sunbird Boat Co., Inc.,* 873 F.Supp. 946, 951 (D.Md. 1994) ("A contract otherwise falling under the Statute of Frauds may nevertheless be

enforceable when there is an admission by the opposing party that the contract was indeed formed."). Such admissions may also be made by a current agent of the party. *Labrecque,* 873 F.Supp. at 951.

In his October 8, 2004, deposition, Brian Oates, SFM's sales manager and a member of SFM's senior management team, testified that the bonus program was unchanged over the time relevant to this litigation. Oates Dep. at 31. When asked specifically about the "2001 Loan Officer Bonus Program," he testified that he believed "this is the one that's still in effect." *Id.* He further testified:

Q. Now, the loan officer bonus program applies to every loan officer employed by the company, right?

A. Yes.

Q. So, if somebody comes in and signs the loan officer bonus program in 2001, as long as. they meet the requirements of that program, they're eligible for a bonus. Right?

A. A[s] long as you meet the criteria that it states here, you're eligible for the bonus.

Q. And if they're still employed in 2002, as long as they meet the criteria of the bonus program, they're eligible for the bonus program for 2002. Correct?

A. I don't think they sign another one. I believe it to be an ongoing thing.

. . .

Q. But the fact that you have signed one every year is irrelevant. If you worked there and you generated loans, and you meet the criteria set forth in the plan, you earn and are paid a bonus. . . . Correct?

A. Yes.

Oates Dep. at 33–35.[9]

In addressing whether compelled testimony such as that given in a deposition

---

**9.** The Court further notes that Defendants in

their pleadings readily acknowledge the exis-

can be utilized to satisfy the Statute of Frauds, the Maryland Court of Appeals made the following observation which the Court finds particularly apropos here:

> it may be urged, on the one hand, that the defendant should not be required to make the admission, because any waiver of the Statute of Frauds should be exercised voluntarily and not under the threat of perjury. On the other hand, it may be contended that the Statute of Frauds is not designed to protect the welsher. If the defendant made the contract, why should it not be enforceable? If he did not make it, he can deny it and set up the Statute of Frauds. It is only the welsher, therefore, who faces the problem of the "compelled admission" and the law should have little solicitude for him.

*Lewis,* 276 Md. at 256, 346 A.2d 231. In adopting the latter position, the court held, "if a party admits an oral contract, he should be held bound to his bargain. The statute of frauds was not designed to protect a party who made an oral contract, but rather to aid a party who did not make a contract, though one is claimed to have been made orally with him." *Id.* (citation omitted).

■ Turning to the merits of Plaintiffs' claim for year-end bonuses, this Court must determine if this case is controlled by the Maryland Court of Appeals decision in *Medex* (as urged by Plaintiffs) or *Whiting–Turner* (as urged by Defendants). This Court finds the facts presented here to be virtually indistinguishable from the facts in *Medex.* In *Medex,* the plaintiff was a sales representative for a medical supply manufacturer. Part of his compensation package was incentive fees based on sales made during defined fiscal years. His employment agreement, however, provided that "[p]ayment from all Company incentive compensation plans is conditional upon meeting targets and the participant being an employee at the end of the incentive plan (generally the fiscal year) *and being employed at the time of actual payment.*" 372 Md. at 33, 811 A.2d 297 (emphasis added by Court of Appeals). The plaintiff resigned from his position four days after the end of the 2000 fiscal year, which occurred on January 31, 2000. Incentive payments for that year were not made until March 31, 2000. Because the plaintiff was not employed on that date, his employer refused to pay plaintiff's fees under the plan. Plaintiff brought suit under the Wage Payment Act to recover those payments.

Reversing the decision of the trial court, the Court of Appeals held that the plaintiff was entitled to the incentive fees. While acknowledging that under common law contract principles, the contract provision would have provided a sufficient basis to deny payment, the Court of Appeals noted that "[c]ontractual language between the parties cannot be used to eliminate the requirement and public policy [of § 3–505] that employees have a right to be compensated for their efforts." *Id.* at 39, 811 A.2d 297. The court found the contract language in question to be invalid and unenforceable. *Id.*

The defendant in *Medex* raised similar arguments to those raised here. Medex asserted that "the 'incentive fees' were not simply commissions, but more akin to a bonus for continued employment," *id.* at 36, 811 A.2d 297, and that "no wage ha[d] been earned without the continuous employment required by the employment pol-

---

tence of the contract. Defs.' Reply at 4 ("There is no dispute that there is an implied contract between SFM and its loan officers providing for payment of a bonus following a loan officer's hire.")

icy." *Id.* at 41, 811 A.2d 297. Rejecting this position, the Court of Appeals held that "the employee's right to the payment of wages vests without satisfaction of the provision of continued employment. To hold otherwise would place the rights of employees to these wages at the whim of their employer, who could simply terminate any at-will employee whose incentive fees it didn't wish to pay." *Id.* at 42, 811 A.2d 297.

In reaching its conclusion, the court relied on one of the earliest decisions in the nation to interpret a wage payment statute, *Burdette v. Broadview Dairy Co.*, 123 Wash. 158, 212 P. 181 (1923). In *Burdette*, the employer sought to justify its failure to timely pay its employees their wages due by relying on a provision in the employment contract that required the employees to give two weeks notice. The employer, a dairy, cited the unique demands for particularly skilled labor in the dairy processing industry as justification for the two week notice provision. As summarized by the Court of Appeals in *Medex*, the *Burdette* court held, "[d]espite the employer's assertions that the provision was an important measure to protect its business ... 'it is clear that the [wage payment] statute establishes a rule of public policy, and that the natural right of the employer and the employee to contract between themselves must yield to what the legislature has established as the law.'" *Medex*, 372 Md. at 40, 811 A.2d 297 (quoting *Burdette*, 212 P. at 182–83).

In deciding *Medex*, the Court of Appeals concluded that its earlier decision in *Whiting–Turner* stood in "marked contrast" to the case before it. 372 Md. at 36, 811 A.2d 297. In *Whiting–Turner*, the plaintiff's employment agreement provided for a weekly salary and, after two years of employment and depending on the profitability of the company, profit sharing. Before the two year mark, the plaintiff told his supervisor that he was considering resigning. As an inducement to keep him from doing so, his supervisor responded, "I have a profit sharing check for you in my pocket. All you have to do is tell me you are staying." *Id.* at 299–300, 783 A.2d 667. The plaintiff resigned anyway and then sued for the bonus check. Under those facts, the court found that the bonus check "was not compensation for the employee's services, but merely a gratuity, revocable at any time before delivery." *Medex*, 372 Md. at 36–37, 811 A.2d 297 (citing *Whiting–Turner*, 366 Md. at 306, 783 A.2d 667). As such, the bonus was not " 'promised for service,' and hence could not be wages." *Id.*

This Court concludes that under *Medex*, Plaintiffs are clearly entitled to the claimed year-end bonuses.

### 2. Terminal Commissions

The resolution of Plaintiffs' terminal commission claims is somewhat less clear. Plaintiffs have not moved for judgment on these claims, asserting that there are issues of fact regarding them that must be resolved by a jury. Defendants have moved for judgment, relying heavily on an unpublished decision issued by this Court last year, *McLaughlin v. Murphy*, Civ. No. CCB-04-767, 2004 WL 1634980 (D.Md. July 20, 2004). They also rely heavily on the argument that it would be too difficult to apportion a commission between the terminated loan officer and the individual taking over the loan and seeing it through the closing. *See* Defs.' Mot. at 16, Defs.' Reply at 10–11. Because of this alleged difficulty, they justify the adoption of their "bright line rule," *i.e.*, that loan officers receive nothing at all unless they are employed at the time of closing, regardless of whether any work had to been

done on the loan after their termination. Defs.' Mot. at 16.

*McLaughlin* provides limited support for Defendants' position. *McLaughlin* involved the claims of a single loan officer. Like Plaintiffs here, McLaughlin was paid on a straight commission basis with no regular salary. Also like Plaintiffs here, his employment agreement provided that, should his employment be terminated, he would not receive a commission on loans that had not settled and funded prior to that termination. After he was terminated for lying about his dealings with a client, McLaughlin brought claims against his former employer under the Wage Payment Act for commissions on three loans that he had originated but had yet to close at the time of his termination.

In rendering her decision, Judge Blake noted that, for two of the pending loans, McLaughlin had signed up the customers for loan programs for which they did not qualify. As a result, these loans had to be completely redone by another loan officer. Significantly, the replacement loan officer was paid the commission once the loans closed. The third loan had yet to close when Judge Blake rendered her decision. 2004 WL 1634980 at *5.

Under these facts, Judge Blake held that McLaughlin was not entitled to commissions on these three loans. In so ruling, she did use language that would appear to bolster Defendants' position. She observed,

> [i]t is not contrary to public policy for [the plaintiff's employer] to decide that commissions will only be paid for those loans that are fully settled. Closing a loan is set forth in the contract as a key element of the broker's job, and the brokerage fees from settled loans are

likely crucial to [the employer's] income. Unlike *Medex*, in this case compensation is not linked to an arbitrary factor such as employment on a particular date, but to a reasonable job requirement. . . . [T]he contract makes clear that his job was to prospect, develop, and settle loans completely, and then he would be paid when those duties were performed. Under the [Wage Payment Law], only when McLaughlin completed *all* those tasks would his right to any payment vest. Because McLaughlin did not do everything required of him under the contract with respect to the three loans at issue, he is not entitled by law to any compensation for them.

*Id.* at *6 (emphasis in original).

In addition to distinguishing the case before her from *Medex*, Judge Blake also contrasted McLaughlin's claims from those brought by a loan officer in another recent Maryland Court of Appeals decision, *Admiral Mortgage, Inc. v. Cooper*, 357 Md. 533, 745 A.2d 1026 (2000). *McLaughlin* at *6 (summarizing the holding of *Admiral Mortgage* as "employee whose sole job was to generate and develop loans was entitled to commissions for loans he completely developed that closed after his resignation"). Looking at the facts in *Admiral Mortgage*, they appear closer to those presented in the instant action, at least as to some Plaintiffs, than those presented in *McLaughlin*.

As with Plaintiffs here, "[Cooper's] job was to generate and pursue leads on potential mortgage loans." 357 Md. at 537, 745 A.2d 1026. Once he obtained a completed application and other necessary documents, he would turn the file over to another employee for processing and closing. *Id.*[10] Also like Plaintiffs here, it ap-

---

**10.** Similarly, Defendants here admit that "a loan officer's main function is to originate

loans and that SFM has a separate processing department and uses outside title companies

pears that the loan officer in *Admiral Mortgage* was not relieved of all responsibilities once the loan was turned over to the loan processor. He testified that after he quit his employment, "he offered to continue to assist Admiral in processing th[e pending] loan applications." *Id.* His employer also testified that, "when a loan officer left, any of his or her pending applications would be worked on by someone else, and that person would be paid the commission when the loan closed." *Id.* at 544, 745 A.2d 1026.[11] Rejecting the employer's assertion that no commission was due on any loan that had not closed by the time the plaintiff left his employment, the jury awarded the plaintiff the unpaid commissions and the Maryland Court of Special Appeals affirmed the judgment based upon the jury award. At the next appellate level, the main issue regarding these commissions was whether there was sufficient evidence of a lack of a bona fide dispute as to plaintiff's entitlement to those commissions to support the trial court's submission of the issue of treble damages to the jury. Cooper's entitlement to the actual unpaid commissions was not contested. *Id.* at 536, 745 A.2d 1026.

 In this action, the Court finds that there are disputes of facts rendering summary judgment on all of the terminal commissions inappropriate. Although Plaintiffs admit that some additional work is often required on pending loans right up until the time of closing, it is unclear how substantial that work truly is for each of the different loans at issue here. Certainly, it is unlikely if much or any additional work had to be done by others on loans that closed immediately after a Plaintiff

was terminated. For example, the Hawkins loan originated by Plaintiff John Bohlander closed the very next day after his termination. *See* Defs.' Responses to Request for Admissions Nos. 1–5. For those loans where no additional work was done, the relevant considerations are the same as those in *Medex:* compensation ($3,677.67 in the case of the Hawkins loan) is being linked to the arbitrary factor of employment on a particular date. This result is particularly disturbing when the person doing the firing also receives a windfall in the form of an increased commission. Bohlander testified that his team manager, Travis Koballa, received a 43% commission on the Hawkins loan, instead of the 16% commission he would have received had he not fired Bohlander on the day before the closing.

Plaintiffs point to other untoward practices on the part of SFM managers that create further doubt as to whether Defendants are entitled to judgment on any of Plaintiff's terminal commission claims. In addition to the example of Bohlander's Hawkins loan, Plaintiffs cite the example of Plaintiff David Moray who had six pending loans close shortly after he was terminated. As a result of Moray's team manager's decision to terminate Moray, the manager received a 43% commission on each of these loans, instead of the 16% commission he would have otherwise received. Moray Aff. ¶ 6, 7.

Defendants' efforts to dispel concerns about these practices do more to highlight them. Without denying that Plaintiff Bohlander's team manager terminated him on May 28, 2003, one day before one of his loans was scheduled to close, Defendants

to handle the actual closing." Defs.' Reply at 7.

**11.** The employer also admitted that "although one or more other employees worked on [the

plaintiff's] pending applications, no commissions were paid to anyone when those loans closed." *Id.*

complain, "[w]hat Plaintiffs neglect to say is that at the time of his termination Bohlander was employed one day a week in order to accommodate his working a full time job elsewhere and that, as of the date of his termination, he had not originated a loan *in over ten weeks*, i.e., since March 10, 2003." Defs.' Reply at 14 (emphasis in original). A review of the three documents that Defendants submit in support of that justification, however, reveals that Koballa approved Bohlander's transition from full time to part time just a few weeks earlier, on April 17, 2003. Defs.' Exh. 14–B. Furthermore, Exhibit 15 reveals that the loan that closed on May 29, 2003, had attached to it the largest commission, by far, of those shown on this exhibit.[12] Exhibit 15 also appears to indicate that Bohlander obtained signatures on loan applications on March 27, 2003, and May 27, 2003, contrary to Defendants' representation that he had not originated a loan since March 10, 2003.[13]

Defendants' explanation for the termination of Plaintiff Moray raises similar concerns. Defendants assert Moray "was terminated on November 10, 2003, for lack of production, *i.e.*, his failure to have generated any loans since October 8, 2003." The supporting exhibit shows that Moray originated a loan on October 1, 2003, another loan on October 2, 2003, another loan on October 7, 2003, and two loans on October 8, 2003. *See* Defs.' Exh. 13. Then, on October 20, 2003, less than two weeks after

Moray had originated two new loans on a single day and five loans within a week, and while Moray had pending loan applications showing total commissions of close to $25,000, his team manager issued an "official Production Warning" concerning Moray, and fired him a few weeks later, on November 10, 2003. Six of Moray's loans closed between November 14, 2003, and December 9, 2003, and, as a result of that firing, all of the commissions went entirely to Moray's team manager. *See id.* Furthermore, it is noteworthy that of the seven loan officers listed on this exhibit, Moray had the highest production by far.[14]

In light of the evidence in the record, the Court cannot conclude that Defendants' bright line rule denying all Plaintiffs their terminal commissions is reasonable. It may well be that there were some loans, like the loans in *McLaughlin*, where another loan officer had to take over after a Plaintiff left SFM, had to do substantial work, and was paid the commission for that work. Defendants have not provided any examples, however, of such a situation.

Defendants' request for summary judgment on Plaintiffs' terminal commission claims will be denied.

### 3. *Greveris's Referral Bonus*

It is undisputed that SFM offers a bonus to all employees who refer someone to the company to work as a loan officer.

---

12. As stated above, this commission was for $5,875.03. The average amount of the commissions on the other loans shown on this document was only $1,862.00.

13. Exhibit 15 is a printout listing details about 9 different loans, including the Hawkins loan. Defendants give no explanation as to what Exhibit 15 might be, but from the context in which Defendants present it, the Court can only assume it is a list of Bohlander's loans.

14. As with Exhibit 15, Defendants give no explanation as to what Exhibit 13 might be. It is also unclear if any of these other loan officers listed on the exhibit were terminated for low production. The Court notes, however, that each of the other loan officers are Plaintiffs in this action and Defendants would have the Court infer that, with the exception of Moray, Bohlander, and LaRicci, all the remaining Plaintiffs ended their employment with SFM voluntarily. *See* Defs.' Reply at 14.

The bonus is equal to 5% of the gross profits for fundings that occur in the second, third, and fourth months of the new loan officer's employ. In support of the motion for summary judgment on his claim for a referral bonus, Plaintiff Greveris states:

> After learning about the referral bonus plan, I referred one of my oldest friends, Joseph A. LaRicci, to SFM. In completing his employment application, Mr. LaRicci wrote that I referred him to the company. Mr. LaRicci was hired as a loan officer on May 28, 2002 and was continuously employed by SFM until July 7, 2003. Both Mr. LaRicci and I had numerous conversations with Chad Tracy, our manager, and members of senior management in which they acknowledged that I would receive a referral bonus with respect to Mr. LaRicci.

Greveris Aff. ¶ 3. Mr. LaRicci had a very successful first few months at SFM and generated 9 loans in the relevant period. *See* Pls.' Exh. B. Under the referral bonus plan, Greveris claims he is entitled to a bonus of $4,220.57 based upon LaRicci's loans.

Defendants offer nothing to directly refute this evidence. Instead, they complain that Greveris's referral bonus claim was not properly pled and ask that the Court so find. In the alternative, Defendants ask that the Court allow them to reopen discovery "to confirm that Plaintiff Greveris satisfied the conditions for payment of such a bonus." Defs.' Reply at 3.

 In the Second Amended Complaint, Plaintiffs alleged that Defendants "failed and refused to pay bonuses earned by at least some of the plaintiffs under the 2002 loan officer bonus program, the 2003

loan officer bonus program, *and/or other bonus programs* maintained by Defendants." Second Am. Compl. ¶ 18 (emphasis added). In his answers to interrogatories, which Plaintiffs served on Defendants on June 14, 2004, Greveris stated that he "was never paid the $4,000 Finders Fee which I was owed for referring Joe LaRicci." Greveris's Answer to Interr. No. 19. Defendants inquired about this referral bonus when Defendants deposed Greveris on September 30, 2004, and Greveris testified much as he did in his affidavit. *See* Greveris Dep. at 31–32. Greveris's referral bonus was also the subject of several questions in the deposition of Samuel Skidmore, a member of SFM's management team. Skidmore Dep. at 114–20.

Defendants did complain about the lack of notice concerning this claim when Plaintiffs attempted to question Defendant Korotki about it in his deposition. The following exchange occurred:

> [Defendants' Counsel]: I'm going to object to this continued line of questioning regarding the referral bonus because there is no claim in the lawsuit as to the nonpayment of a referral bonus, but go ahead and answer.
>
> [Plaintiffs' Counsel]: I think there is.
>
> [Defendants' Counsel]: I mean, if you want to point me to it, but we don't need to do that now, you can go ahead and answer.

Korotki Dep. at 90.[15] Aside from this exchange, there is no record of Defendants taking issue with Plaintiffs' pursuit of this claim prior to the filing of their opposition to Plaintiffs' motion.

The Court finds that the claim was adequately pled and that Defendants are not entitled to reopen discovery. Under the

---

**15.** In their Reply, Defendants cite to and supply page 19 of Korotki's Deposition. Defs.' Reply at 3. The exchange in question, of which Defendants quoted only a portion, is actually found on page 90 of Korotki's deposition.

Federal Rules, the complaint is to give a short and plain statement of the claim, with the understanding that discovery is available to fill in the details. *See* Wright & Miller, *Federal Practice and Procedure: Civil* § 1376, at 737–738 (observing that "the theoretical overall scheme of the federal rules calls for relatively skeletal pleadings and places the burden of unearthing the underlying factual details on the discovery process"). Here, Defendants were readily able to frame discovery to elicit the information regarding Plaintiffs' claims for unpaid bonuses, and were, in fact, supplied with that information last June, well before the end of discovery and, it appears, well before depositions were taken. Choosing not to fully explore this issue in discovery, for whatever reason, does not provide grounds for them to be given another opportunity.

Because Plaintiffs have provided evidence establishing that Greveris is entitled to the referral bonus, and Defendants have failed, after adequate time for discovery, to produce sufficient evidence to demonstrate that a triable issue of fact exists for trial,[16] the Court concludes that summary judgment should be entered on Greveris's referral bonus claim.

#### 4. Treble Damages Under the Wage Payment Law

■ Where an employee brings an action against an employer to recover unpaid wages and it is established that the employer's withholding of the wages was not

the result of a bona fide dispute, the employee may be awarded an amount up to three times the unpaid wage. Md.Code. Ann., Lab. & Empl. § 3–507.1(b). Defendants have moved for summary judgment on Plaintiffs' treble damages claim arguing that Plaintiffs have failed to introduce facts that would allow an inference that Defendants had no bona fide reason for failing to pay wages upon their terminations. Plaintiffs contend that their entitlement to treble damages is an issue properly left to the jury.

■ As is evident from the above discussion, the Court finds sufficient evidence to raise questions as to Defendants' credibility in withholding wages. Accordingly, Defendants' motion will be denied as to these claims as well, and the issue of treble damages will be left for the jury. *See Medex*, 372 Md. at 44, 811 A.2d 297 (reversing lower court's finding of bona fide dispute and observing " 'the determination of discretionary damages is quintessentially a matter for the trier of fact,' and therefore, the determination of a bona fide dispute and award of treble damages was for the jury," *quoting Admiral Mortgage*, 357 Md. at 550, 745 A.2d 1026).

### IV. CONCLUSION

For the reasons stated above, the Court reaches the following conclusions:

(1) Count III of the Second Amended Complaint will be dismissed;

---

**16.** Defendants did present a copy of LaRicci's employment application, Defs.' Exh. 20, and argue that this application shows "there *may* be a genuine issue of material fact" regarding who referred LaRicci. Defs.' Reply at 3 (emphasis added). On the application, in answer to the question, "How were you referred to this company?," a name is written that is crossed out and above it is written the name Rob Greveris.

The fact remains that Rob Greveris is identified on the application as the referring party. If this application, which presumably was in the possession of Defendants, created questions in Defendants' minds that needed to be explored in discovery, they should have done so. For the reasons stated above, it is too late to do so now.

(2) Plaintiffs are entitled to summary judgment on their minimum wage claims in the aggregate amount of $97,430.60, as set forth in the exhibits accompanying Plaintiffs' motion;

(3) Plaintiffs' overtime claims are not subject to the motor carrier exemption;

(4) Plaintiffs are entitled to liquidated damages under 29 U.S.C. § 216(b), in an amount equal to their awards for unpaid minimum wage and overtime payments;

(5) Plaintiffs are entitled to summary judgment on their claims for year-end bonuses in the aggregate amount of $74,427.87, as set forth in the exhibits accompanying their motion;

(6) Defendants are not entitled to summary judgment on Plaintiffs' claims for unpaid terminal commissions;

(7) Plaintiff Robert Greveris is entitled to summary judgment on his claim for a referral bonus in the amount of $4,220.57; and

(8) Defendants are not entitled to summary judgment on Plaintiffs' claims for treble damages under Maryland's Wage Payment Law.

In light of these rulings, the following issues remain in need of resolution:

(1) a determination of the amount of Plaintiffs' overtime claims;·

(2) a determination of the amount of the award to which each Plaintiff is entitled for terminal commissions, if any; and

(3) a determination of the amount of the award to which each Plaintiff is entitled under Md.Code Ann., Lab & Empl. § 3–507.1(b), if any. A telephone conference will be held on Thursday, March 24, 2005, at 10:00 a.m. to schedule the remaining proceedings in this action.