932 A.2d 1197

Calvin HOFFELD

v.

SHEPHERD ELECTRIC CO., INC.

No. 1085, Sept. Term, 2006.

Court of Special Appeals of Maryland.

Sept. 24, 2007.

184

Kimberly A. Kline, Baltimore, for appellant.

Donald J. Walsh, Owings Mills, for appellee.

Panel: MURPHY, C.J., ADKINS, and WILLIAM W. WENNER (Retired, specially assigned) JJ.

ADKINS, J.

Under section 3–505 of the Maryland Wage Payment and Collection Law (MWPCL), codified at Md.Code (1991, 1999 Repl.Vol., 2006 Supp.), § 3–501 *et seq.* of the Labor and Employment Article (LE), employers must pay "all wages due for work that the employee performed before the termination of employment." In *Medex v. McCabe,* 372 Md. 28, 41–42, 811

A.2d 297 (2002), the Court of Appeals held that this law may not be circumvented by an employment agreement that explicitly conditions payment of earned commissions on continued employment.

Appellant Calvin Hoffeld asks us to hold that his former employer's unwritten commission policy is another unenforceable attempt to circumvent this law, if not on the face of the policy, then as it has been applied. The salient features of the policy that Hoffeld challenges are as follows:

(1) Customers submit purchase orders, but typically specify a later date on which they want the product shipped.

(2) Customers are invoiced on the same day a shipment is made.

(3) Commissions are payable when products on the purchase order are shipped and invoiced.

(4) Commissions are determined on the basis of "margin," which is the difference between the cost of the product and the price at which it is sold, with both figures being set as of the date on which the product is shipped and invoiced.

(5) **Commissions are paid to the sales representative who is assigned to the customer account on the shipping and invoicing date,** so that sales representatives do not receive commissions on shipments made after their employment terminates.

Hoffeld contends that this last aspect of appellee Shepherd Electric Co.'s "fulfilled order" commission policy violates the MWPCL by conditioning payment of earned commissions on continued employment. Following a bench trial, the Circuit Court for Baltimore County disagreed, finding that Hoffeld did not earn commissions when purchase orders were submitted, but rather when goods were shipped and invoiced, so that he did not prove that he earned the commissions in question during his employment.

From judgment in favor of Shepherd, Hoffeld raises four issues for our review:

I.    Did the trial court fail to apply properly the Wage Payment Collection Law as set forth in case law[,] thus permitting Appellee to illegally condition payment of commissions on continued employment?

II.    Did the trial court err in finding there was a written contract of employment that contained all terms of employment despite uncontroverted testimony that there was actually an oral agreement with terms that Appellee was to be paid on particular pieces of business of jobs that Appellant secured for Appellee?

III.    Did the trial court err in validating and endorsing Appellee's dealings with regard to the other employees' commissions that were in contravention of the Wage Payment Collection Law as well as being of no relevance to the instant action?

IV.    Did the trial court err in not applying the "procuring cause doctrine" despite evidence that showed the Appellant's efforts and services were the primary, proximate, and procuring cause of business for the Appellee?

We find no error and affirm the judgment.

## FACTS AND LEGAL PROCEEDINGS[1]

Shepherd is a Maryland corporation engaged in the business of supplying wholesale and retail electrical supplies for commercial use. Customers include contractors who competitively bid for projects that require electrical supplies offered by Shepherd. The company employed Hoffeld as an outside sales representative from 1994 through January 16, 2003, the date of Hoffeld's voluntary resignation. During that time, Hoffeld was one of Shepherd's top outside salesmen in terms of commissions earned.

---

1.  Few "first-level" facts material to this lawsuit were contested at trial. To the extent there was disagreement, we present the evidence in the light most favorable to Shepherd, as the prevailing party at trial.

## Outside Sales Representative Duties

Hoffeld's primary job was to service customer accounts assigned to him, by "grow[ing] the customer, to generate new business, to entertain them." He coordinated with Shepherd's inside sales representatives and other departments to act as the company's service liaison to that customer. Hoffeld's duties included calling on contractors two to three times a week in an effort to develop opportunities for Shepherd to bid on customer requirements and to maintain good working relations on existing jobs. Among his regular activities were visiting job sites and offices, obtaining building plans for projects on which customers intended to bid, and hosting company representatives for meals and outings such as fishing trips, NASCAR events, golf games, and even trips to Florida. In addition to developing new business, Hoffeld was required to handle any issues concerning business in progress with the customer. These duties included dealing with change orders and problems concerning items already shipped.

Stewart Vogel, Shepherd's president, testified that, at the time of trial, Shepherd employed 30–40 inside salespersons and 11 outside salespersons. In contrast to an outside salesman,

> an [i]nside salesperson would be somebody that sits behind a desk and orders—well, he would quote material, and if he was successful ... in a quote, he would be given an order. He would proceed with the order, enter the order, and from that point on, there is tons of things that could be done, expediting, [returns], change orders. You know, there is tons of stuff he could get involved with before the job is finished out.

Dave Pulias, Shepherd's former vice president for sales and purchasing who hired and supervised Hoffeld while he was with the company, explained that

> [t]he way the system is set up ... [is] for outside people to develop a relationship that generates business and inside people to capture business handling the business process, ... and hopefully ... we keep the customer, and inside

people keep generating business, and the relationship is now with the house. . . . It is all about their relationship and billing relationships. It is not about the specific things they do as far as processing anything.

As a result of this business model, Pulias testified, outside salesmen did not see most of the orders placed by their assigned customers. Because "[t]he outside people were to develop the relationship and generate specific business or atmosphere for them to do business with us, . . . in a lot of cases, . . . the flow of business came from the customer to the inside [sales] staff." Thus, although "[s]ometimes [a purchase order] came through outside people, . . . in general, it came directly to our inside people."

Both inside and outside salespersons had significant continuing responsibilities after purchase orders were submitted. Vogel testified that the outside salesperson is the company's established "conduit" to the customer, through which information provided in whole or in part by the inside salesperson is communicated at all stages of business. For example,

[i]f you were on an account, Enterprise Electric, and they asked you a question about a large job that you had a PO on, you would take down the notes, take the information down, take it back to Shepherd, our headquarters. You would get together with the internal people and you guys would work it out, and you, as the outside salesperson, would get back to the customer or you would have the inside salesperson get back to the customer. . . . [I]f I told Enterprise that, . . . I'm sorry, but you have got to totally refer to the inside person, I don't think they would have any respect for me. I don't think I would be welcome there.

Shepherd's customers specify when the products listed on each purchase order are to be shipped. Consequently, there is usually an interval between the date on which a purchase order is submitted and the date on which the ordered materials are shipped and invoiced. We shall refer to this as the "order interval." Order intervals varied from a matter of days

to months, sometimes even years, depending on the nature of the project and purchase order.

During the order interval, the Shepherd salesperson assigned to that account continues to service both the customer and the order, through shipment, delivery, invoicing, and payment. Change orders occurred frequently, and were to be expected on large purchase orders and projects. For example, Hoffeld was involved, post-purchase order, in dealing with manufacturers from whom Shepherd was ordering materials specified in his customer's purchase order and in "value engineering" adjustments.[2] In addition, outside sales representatives assisted with troubleshooting, including expediting, billing, return, warranty, credit, and collection issues. According to Vogel, Hoffeld personally involved him "on numerous occasions" with post-purchase order problems, for example, obtaining his approval for write-offs or credits back to one of Hoffeld's assigned accounts as a result of "problems on the jobs[.]" Carmen Grieves, Shepherd's controller, testified that she frequently worked with Hoffeld in resolving payment issues, and that Hoffeld was directly involved in post-purchase order returns and credits on the same jobs for which he was claiming post-termination commissions.

## Commission Policy And Practices

Throughout Hoffeld's employment with Shepherd, he was paid entirely on the basis of gross margin, which is "the difference between cost and sales." This arrangement was individually negotiated by Hoffeld and Pulias, and memorialized in two handwritten memos that Pulias wrote at the time he hired Hoffeld. The agreement reflected that Hoffeld

---

2. Vogel testified that

[v]alue engineering is where there is a job and a contractor might say, the owner is asking me to do it for less. You came in with a good number to begin with, but they still want to do it for less. This goes on all the time. . . . The contractor will come to us and say, we want a better number. Value engineering would be where they take copper out and put aluminum in, something less expensive, and we will reduce the price on the job.

planned to work one or two days each week, and that he would be initially assigned only to the L.H. Cranston account, which was one of the "house accounts" that Pulias himself had been servicing while he also performed his sales management duties. The business plan was for Hoffeld to take over the Cranston account in an effort to grow that business, because he had done considerable work with that company during his career.

The deal was slightly different than Shepherd's employment arrangements with other outside salesman, in that Hoffeld did not receive a draw or other salary, and earned commissions at the higher rate of 20% of margin for the first 18 months, with a monthly expense account of $250, and 15% of margin thereafter. According to Hoffeld, he preferred this arrangement because he always worked solely on commissions in his prior positions with Shepherd's competitors over the preceding 30 years.

There was no dispute on the question of when and how commissions were to be calculated. In accordance with long-time Shepherd practice, the amount of a commission is determined as a percentage of margin on the date that an order is shipped, which is also the date that order is invoiced. Pulias and Hoffeld agreed that margins cannot be calculated earlier, based for example on the initial purchase order, because changes are commonly made to the order and/or margins during the order interval. According to Vogel, on any "big job, there is usually something" that requires the attention of the outside sales representative during the order interval between the purchase order date and the shipping/invoicing date.

Carmen Grieves, Shepherd's controller who handles all payroll and accounting responsibilities, testified that each month, on the 25th in accordance with industry practice, Shepherd issues sales and commissions reports that list all products that were shipped and invoiced in the preceding month. The reports list the figures necessary to calculate commissions,

including merchandise total and gross margin, but do not reflect purchase orders received during that period.

Grieves explained that sales commissions are calculated on the gross margins of shipped items as of the invoicing date, and then calculated and entered by hand on a commission schedule prepared by Grieves or under her supervision. Purchase orders are "never" seen in the accounting department, much less considered, in calculating commissions. Margins subsequently may be diminished by returns and warranty issues, in which case Shepherd adjusts the gross margin and takes a corresponding deduction against the commission paid on that product.

Hoffeld neither disputes nor challenges these aspects of Shepherd's commission policy. Rather, the feature about which Hoffeld complains is Shepherd's practice of paying commissions to the outside sales representative who is assigned to the customer account on the date product is shipped and invoiced, rather than to the account representative who was assigned to that customer on the date the purchase order was submitted. When a sales representative leaves Shepherd's employ, the company reassigns the customers he serviced to another outside sales representative, who services the account during the order interval and after products are shipped and invoiced.

In Hoffeld's view, a commission is earned at the time Shepherd receives the purchase order, even if the amount of the commission cannot be determined until Shepherd ships and invoices. Shepherd disagrees, contending that the commission is not earned until an order is shipped and invoiced. Thus, when a sales representative procures a purchase order from one of his customers, but leaves Shepherd's employ during the order interval, he receives no commission for purchase orders he helped to generate while servicing that account. Instead, the entire commission is paid to the newly assigned account representative.

Hoffeld routinely received a copy of his individual monthly reports. According to Grieves and Vogel, Hoffeld never com-

plained about receiving commissions only after products were shipped and invoiced. Grieves testified that Hoffeld was paid commissions on all shipments invoiced through January 16, 2003, the date he voluntarily left Shepherd's employment. She explained that, after Hoffeld left, commissions on the accounts he serviced were paid to other salesman from the day they were assigned to those accounts.

## Trial

Hoffeld filed suit in the Circuit Court for Baltimore County, claiming commissions on specific purchase orders submitted before January 16, 2003, but shipped and invoiced thereafter. Trial focused on the related questions of when the parties considered a sale to be complete and a commission to be earned. Shepherd's president testified that "the sale is not made until it is shipped and invoiced" because "too many changes ... can happen," including complete cancellation of the purchase order.[3] For that reason, the company treats a sale as complete, and therefore the sale commission as having been earned, when the product is shipped and invoiced, rather than when a purchase order is submitted. According to Vogel, "You have to pick a point. The whole industry does it this way."

On the question of when a sale was complete, Dave Pulias and Carmen Grieves testified that monthly sales reports showed only "what got shipped and invoiced." Copies of such reports, including those recording sales and commissions generated by Hoffeld's customers, were introduced into evidence. Neither these reports, nor invoices sent to customers, reflected when a purchase order was received.

From Pulias's perspective,

---

**3.** Vogel testified that Shepherd allows customers to cancel orders even after a purchase order has been submitted, in order to obtain future business. "[I]t wouldn't be in our best interest" to sue for breach of contract, "because then you would lose a customer long term." Shepherd even cancelled one purchase order after goods had been shipped, making arrangements for returns but passing along the manufacturer's restocking charges to the customer.

the sale is completed when it is invoiced. The sale is a long process. It starts with the purchase order, a contract. We have a sale, and then the process of shipping. We may have to order it or it could be an out-of-stock order from the factory. To me, it is . . . a completed sale, when I invoice it.

It could continue on where he wants a return. It is still not complete. Once I have an order form, you give me an order form, a purchase order, I have a sale. It just from this point on, it starts.

As to when a commission was earned, however, Pulias testified on cross-examination that, "when we got an order in house as part of a contract," he considered a commission to have been "earned . . . in the sense that we know we are going to pay them commission, because it is an order assigned to that account, whoever it is." He confirmed that, although he could not specifically recall whether any commissions were paid to Hoffeld on the basis of purchase orders that Cranston placed before Hoffeld started work with Shepherd, Hoffeld should have been given credit for shipments "unless the salesman that was there was still there."

According to Pulias, Shepherd did make some exceptions to its commission policy when responsibility for a particular customer transferred from one outside salesperson to another during the order interval. Pulias explained that "in a lot of cases," the company "manually sometimes would take and give that guy a credit by manually moving it after we got the computer report . . . if a salesman still worked for us." "Otherwise, . . . whoever was the salesman of record would have gotten paid."

On redirect, Pulias offered the following clarification of his testimony regarding when a commission was "earned":

If by earned, I knew who was going to get paid the commission, the person that was assigned that account, when they got the purchase order at the time. I assume he is going to get paid, so they earned it. That is the context in which I use that.

The trial court then asked for further clarification:

The Court: The last thing you were saying is the commission was earned when the PO was received from the customer?

[Pulias]: Well, I never—I was asked to use the word earned, so I kind of agree they earned it. It is not like we are not going to pay them commission. We know who has the account, so we get purchase orders, we are going to pay commission to that salesman that is assigned.... [I]n that context, at the time we get purchase orders, I know who earned the commission. I just don't know how much or when it will get paid, and that is the way I interpret that usage....

**The Court: You say he earned it when it came in. That is what I want to know. When did it come in?**

**[Pulias]: There is no hard and fast rule. If I have a bunch of purchase orders in house, ready to be shipped or invoiced or I am going to ship next week, I could consider that business I have and have not invoiced yet, or I could consider it no sale until I invoice it.... I think it is a gray area. That is all I am saying.**

**The Court: Was there any discussion with Mr. Hoffeld as to at what point he earned the commission?**

**[Pulias]: No....**

**The Court: If he left at some point before the job was billed or product was sent, had he earned the commission?**

**[Pulias]: I guess that is subjective, Your Honor.... [T]hat is an issue I never considered or dealt with. So you know, I can't answer that because I just never considered it....**

The Court: Has the salesman done all the work necessary when the purchase order is received from a customer to earn the commission?

[Pulias]: Up to that point, yes. Yes, if we have something in house, he is going to get a commission on that.... I don't know about the question about when he is gone.... [S]ometimes on accounts we would re-assign in house, because we

hired somebody and maybe we switched the account, . . .
and if a guy had orders in-house he had brought in or been
involved in, we manually, in a lot of cases, calculated that
commission and gave it to the original salesman who was on
the account when the PO was generated, even though it
hadn't shipped. . . .

In a lot of cases, it may have been something in process,
half was billed out, so there are precedents for that.

The Court: In those situations, did you split the commission
with the new salesman assigned to the account or did the
former salesman assigned to the account get the entire
commission?

[Pulias]: I don't remember. It was on a case by case basis.
It is possible over all the years we may have split some-
thing.

The Court: That sounds to me like that wasn't any particu-
lar agreement. It was just—

[Pulias]: Right. It was something we did. They no longer
had the account. They no longer got paid under the
account.

**The Court: So is any of this the issue as to whether a
salesman had become entitled to a commission for a
purchase order? Was that ever discussed with a sales-
man, communicated to a salesman as part of an employ-
ment agreement?**

[Pulias]: **I never discussed it until now, to be honest**. . . .

The Court: And if I understood your testimony, there really
was no—certainly no spoken agreement as to at what point
Mr. Hoffeld would become entitled to the commission?

[Pulias]: No, not to phrase it that way, no. (Emphasis
added.)

Hoffeld admitted that he was aware of Shepherd's policy
from the outset of his employment. He explained that this
"was the arrangement with any electrical distributor I worked
for. You either had the account in your name and you were
getting the commission or somebody else was getting it."
Hoffeld understood the policy to mean that he started receiv-

ing commissions on materials shipped to Cranston from the moment he was assigned to that account, but could not say specifically whether he received commissions on Cranston shipments under purchase orders that had been submitted before he started working at Shepherd.

Nevertheless, Hoffeld also testified that he believed that his commission was "earned" when Shepherd received a purchase order from one of his customers. The trial court inquired at length about the foundation for Hoffeld's belief:

The Court: What is the basis for your understanding? Why is that what you believe?

[Hoffeld]: My job was to increase business with L.H. Cranston and other accounts that they subsequently assigned to me.

When I received that purchase order, I did all that I was supposed to do, get the order for Shepherd, instead of it going to [a competitor]. . . .

The Court: Was there anything said at the beginning of your employment between you and any officer of Shepherd regarding when you earned the commission or when the commission was due?

[Hoffeld]: Probably the second part of the question, it was due when it was shipped. In other words, my . . . monthly commission would be calculated on what was shipped that particular month up to the closing date.

The Court: When did you have any conversation about that?

[Hoffeld]: It might have been part of my original contract as to how . . . they generated their—when did I get paid, do I get paid initially. . . . I am assuming that would have been on my initial conversation with them, with Mr. Pulias. In other words, when do I get paid? We pay every two weeks, but once a month we settle up. They take the draw that they had given you for two preceding weeks and deduct that from what your commission [is] for that month. You get the difference in your pay check. . . .

The Court: Did you have any conversation about when you earned the commission?

[Hoffeld]: No. I don't remember specifically.

In all fairness, I had been in the business already at that point in time probably 30 years. That is how everybody is paid....

The Court: So it was your understanding you would not be paid until the product was shipped and invoiced by Shepherd?

[Hoffeld]: That is correct.

The Court: And you knew that because of both your conversation with Mr. Pulias and because that is what the industry does?

[Hoffeld]: Yes, sir.

The Court: You believed that you had actually earned the commission prior to the time that product was shipped?

[Hoffeld]: Yes, sir....

The Court: But there was no conversation regarding when it was that you actually earned the commission?

[Hoffeld]: No....

The Court: ... There was nothing in writing between you and Shepherd about when you earned the commission or when you would be paid?

[Hoffeld]: No, sir....

The Court: Again, to go back to the next question about the basis of understanding when you believe you earned your commission, nobody said anything, that was just what you assumed?

[Hoffeld]: Yes, sir. (Emphasis added.)

At the conclusion of the bench trial, the trial court ruled that Hoffeld failed to prove that he earned the disputed commissions before his employment ended, and therefore failed to prove that Shepherd violated the MWPCL. Hoffeld noted this timely appeal.

## DISCUSSION

As a result of Shepherd's commission policy, Hoffeld complains, outside sales representatives are denied commissions they have earned on purchase orders generated by work performed before termination. In his view, that is what happened to him. He was paid commissions only on orders shipped and invoiced through January 16, 2003, his final day of employment at Shepherd, but "did not receive any commissions on" customer purchase orders "worth hundreds of thousands of dollars in profit to Shepherd" that were "invoiced within days after [his] last day[.]" As confirmed by Vogel and Grieves, those particular commissions were paid to the salesmen who were reassigned to Hoffeld's accounts.

### Payment Of Commissions After Employment Terminates

█ Under the MWPCL, employees must be paid for "all wages due for work performed before the termination of employment." LE § 3–505. Commissions are wages for purposes of this requirement. *See* LE § 3–501(c)(1)(ii). A MWPCL claim may arise for a commission that was earned for work performed during employment, even if it was not payable until after termination. *See Medex v. McCabe,* 372 Md. 28, 35–36, 811 A.2d 297 (2002); *Admiral Mortgage, Inc. v. Cooper,* 357 Md. 533, 540, 745 A.2d 1026 (2000).

█ "[A]n employee's right to compensation vests when the employee does everything required to earn the wages." *Medex,* 372 Md. at 41, 811 A.2d 297. The MWPCL "affords relief only when the employee 'ha[s] performed all the work necessary to earn the [compensation]' **before termination."** *Stevenson v. Branch Banking & Trust Corp.,* 159 Md.App. 620, 646–47, 861 A.2d 735 (2004).

█ Whether an employee has earned a commission depends on the terms of employment. *See Whiting–Turner Contracting Co. v. Fitzpatrick,* 366 Md. 295, 305, 783 A.2d 667 (2001). Terms governing payment of commissions may be a matter of "agreement in advance of the employment or to

become a part of the undertaking during the employment."
*Id.*

In *Medex v. McCabe,* the Court of Appeals held that an employer may not refuse to pay commissions earned by an employee simply because the employee no longer works for the employer, even when a written employment agreement explicitly conditions payment of such commissions on continued employment. *See Medex,* 372 Md. at 41–42, 811 A.2d 297. McCabe earned a base salary plus "incentive fees" that were payable in accordance with a series of incentive compensation plans. Under this compensation scheme, "some of the incentive fees 'begin to earn' at meeting 80% of a target goal, while another '[i]ncentive begins' upon the sale of certain goods." *Id.* at 37, 811 A.2d 297. Medex identified these incentive fees as one part of the employee's " 'Total Target Cash Compensation' " in that they "were supplemental to the fixed salary as a combined measure of compensation." *Id.* at 42, 811 A.2d 297. But the payment of incentive fees was explicitly " 'conditional upon . . . the [sales representative] being an employee at the end of the incentive plan (generally the fiscal year) *and being employed at the time of actual payment.*' " *Id.* at 33, 811 A.2d 297. McCabe resigned on January 31, 2000, four days after the incentive period ended, but before incentive fees were paid on March 31, 2000. Invoking the requirement that he be employed by Medex at the time of payment, the company refused to pay McCabe the fees. *See id.* at 34, 811 A.2d 297.

The Court of Appeals concluded that these incentive fees were tantamount to sales commissions, and therefore fall within the definition of wages under the MWPC. *See id.* at 37, 811 A.2d 297. The Court refused to enforce the "employment at the time of payment" condition in the written policy on the ground that, on its face, it violated the MWPCL. *See id.* at 41, 811 A.2d 297. "Contractual language between the parties cannot be used to eliminate the requirement and public policy that employees have a right to be compensated for their efforts." *Id.* at 39, 811 A.2d 297. "A contract that necessitates the deprivation of some portion of the fees worked for by the employee contravenes the purposes of the Act." *Id.* at 41,

811 A.2d 297. Having performed all the work necessary throughout the incentive period to satisfy the objective sales benchmarks, McCabe did everything necessary to earn the incentive fees and was entitled to recover them. *See id.* at 42, 811 A.2d 297.

Hoffeld correctly recognizes that *Medex* requires post-termination payment of all commissions he earned during his employment. Moreover, *Medex* teaches that courts will not enforce a commission payment policy that, on its face, violates the MWPCL mandate that employees must be paid for work performed before termination. Similarly, the *Medex* rationale may be extended to encompass "as applied" challenges to a policy that does not explicitly condition payment of commissions on continued employment, but effectively requires that. *See, e.g., Rogers v. Savings First Mort., LLC,* 362 F.Supp.2d 624, 643–46 (D.Md.2005)(employer's motion for summary judgment denied because mortgage brokers presented evidence that they were terminated in circumstances raising reasonable possibility that employer used termination as pretext to avoid paying commissions and/or supervisor used termination as pretext to redirect commissions to himself, without performing any additional work).

Yet neither *Medex,* nor other MWPCL cases involving commissions payable after termination answer whether Hoffeld earned the sales commissions in question during his employment. That is because none addresses the "delayed sale of goods" scenario here, which turns on the question of when Hoffeld earned his commissions—was it when purchase orders were submitted or when orders were shipped and invoiced? *Cf. Admiral Mortgage,* 357 Md. at 540 n. 6, 745 A.2d 1026 (mortgage originator whose commissions were due to be paid when loans closed did not raise issue of whether he earned commissions prior to closing); *Rogers,* 362 F.Supp.2d at 643–46 (mortgage brokers presented sufficient evidence to raise factual dispute as to whether employer terminated them for pretextual reasons in order to prevent them from earning commissions by precluding presence at loan closings); *Butler v. VisionAIR, Inc.,* 385 F.Supp.2d 549 (D.Md.2005)(employer's

motion for summary judgment denied in case involving software licensing commissions, where duties of account executive ended when customer signed contact, and written policy provided that commissions were not due until employer received payment, but limited payment to six months following termination).

## I.

### Payment Of Commissions Was Not Improperly Conditioned On Continued Employment

The trial court found that Hoffeld did not earn the disputed commissions during his employment. Although acknowledging that he performed some work to generate purchase orders that eventually resulted in sales for Shepherd, the court concluded that "there was no promise to pay [Hoffeld] when the purchase order was received[.]" Rather, the court ruled, commissions were not earned until the shipping/invoicing date, because "obtaining purchase orders is not the lone service to be performed by an outside salesman," and "there [was] more work to be done after a purchase order was received[.]"

Hoffeld contends that Shepherd's unwritten commission policy, as applied, is a "thinly veiled attempt to circumvent the [M]WPCL as well as the abundant case law" that prohibits employers from conditioning payment of wages upon continued employment. He asks us to declare the policy unenforceable as against public policy, specifically challenging three aspects of the trial court's reasoning.

First, Hoffeld contends that the trial court erred in concluding that the sale does not occur for commission purposes when a purchase order is submitted. He asserts that the outside sales representative's continued servicing of the account during the order interval is merely "done ... so that the customer will continue placing purchase orders in the *future*." Second, even if sales representatives may have additional service responsibilities between the purchase order and the invoicing date, he argues, the trial court erred in failing to "address who

would be entitled to commissions *if there was no additional activity done or needed[,]* " such as when the first half of a job shipped and invoiced the day before the salesman's last day, whereas the second half shipped and invoiced the day after. Finally, Hoffeld complains that Shepherd's acknowledged exceptions to its commission policy for sales representatives who remain "in-house" prove that the company only refuses to compensate a sales representative if he is no longer employed by the company.

The trial court's decision rests on its threshold finding about the terms of Shepherd's unwritten policies with respect to when sales occurred and when commissions were earned. We review for clear error the court's conclusion that sales were made and commissions were earned when orders were shipped and invoiced, giving due regard to the court's assessments of credibility, resolution of disputed facts, and weighing of evidence. *See* Md. Rule 8–131(c). We must consider the evidence in the light most favorable to Shepherd, as the prevailing party, and accept the trial court's factual findings if there is substantial evidence in the record to support them. *See City of Bowie v. Mie Props., Inc.,* 398 Md. 657, 676, 922 A.2d 509 (2007).

■ There is ample support in this record for the trial court's factual finding that Shepherd's policy was that sales did not occur, and therefore commissions were not earned, until orders were actually shipped and invoiced. Shepherd's president and controller both testified that, consistent with industry-wide practice, the company treats a purchase order as merely one step in a long process of making a sale. Even though that continuum begins with the outside sales representative soliciting business, and takes a significant turn when a purchase order is submitted, the sale does not occur until ordered goods are actually shipped and invoiced. Hoffeld did not object to this policy and practice. To the contrary, the multitude of steps necessary to finalize a sale were confirmed by both Hoffeld and Pulias, his former sales supervisor.

■ The trial court's decision also necessarily reflects its tacit conclusion that Hoffeld failed to prove that Shepherd's commission policy violates the MWPCL, either on its face or as applied. Applying the law to the facts as the trial court found them, we review this aspect of the ruling to determine if it is legally correct. *See, e.g., Medex*, 372 Md. at 41–42, 811 A.2d 297 (court may not enforce commission policy that violates MWPCL). In this instance, we find no error in the court's determination to enforce the commission policy.

Unlike the policy in *Medex*, Shepherd's commission policy did not explicitly condition payment on continued employment. Therefore, the policy did not violate the MWPCL on its face. We turn, then, to the trial court's conclusion that Shepherd's policy, as applied, did not violate the MWPCL by denying Hoffeld commissions he earned before he left Shepherd's employ. Although we acknowledge the possibility that an employee might establish such a violation in circumstances involving a bright line "all or nothing" commission policy, we cannot say that Hoffeld did so in this instance.

The trial court found that Shepherd proved that it has a legitimate, non-pretextual business justification for designating the shipping/invoicing date as the point when a sale is made and a commission is earned. Hoffeld himself acknowledged that he was required to service both the account **and each individual purchase order** through the shipping/invoicing date. All witnesses agreed that, during the order interval, business requirements for a customer's particular project frequently evolved in terms of the nature, amount, and/or prices of the goods specified, inevitably requiring adjustments to the original purchase order. Indeed, Shepherd even allows customers to cancel purchase orders without penalty before shipments are made. Most importantly, such changes require the outside sales representative to perform additional work throughout the order interval, continuing those duties until the order is actually shipped. These services commonly include working with the customer and Shepherd's inside sales representatives on requests for value engineering and other changes to goods identified in the purchase order.

Thus, contrary to Hoffeld's contention that post-purchase order work is performed solely to solicit future business from the client, the record shows that outside sales representatives have significant duties pertaining to *pending* purchase orders, and that these duties continue through shipment and invoicing. Because Shepherd has a legitimate business reason to require its outside sales representatives to perform such work until an order is shipped, it also has a legitimate business reason to treat a commission as earned at that time.

We do not find it unreasonable, or against the public policy established in the MWPCL, for employers of sales representatives to tie commissions to the occurrence of a fulfilled order for goods. Although we found no analogous commission case involving tangible goods, Shepherd's commission policy invites comparison to the "commissions earned at loan closing" agreement upheld in *McLaughlin v. Murphy,* 372 F.Supp.2d 465 (D.Md.2004). There, the federal district court rejected a mortgage broker's MWPCL claim that he was owed commissions on loans that he generated but did not close before his employment terminated. *See id.* at 473–74. In doing so, the court distinguished the "must be employed on the date of payment" proviso struck down in *Medex:*

> In contrast to *Medex,* the employment contract between McLaughlin and Freedmont does not condition payment of commissions on an employee's continued employment. Rather, it conditions payment on the closing of the loan. **It is not contrary to public policy for Freedmont to decide that commissions will only be paid for those loans that are fully settled. Closing a loan is set forth in the contract as a key element of the broker's job, and the brokerage fees from settled loans are likely crucial to Freedmont's income. Unlike *Medex,* in this case compensation is not linked to an arbitrary factor such as employment on a particular date, but to a reasonable job requirement.** The fact that it might take more effort to find clients than to close a loan does not make the employment contract illogical or contrary to the policy of the MWPCL. If McLaughlin's job were simply to find loan

clients and start the process, then Freedmont would have to pay him for his efforts. *See Admiral Mortgage, Inc. v. Cooper*, 357 Md. 533, 540–51 [745 A.2d 1026] (2000)(employee whose sole job was to generate and develop loans was entitled to commissions for loans he completely developed that closed after his resignation). **But the contract makes clear that his job was to prospect, develop, and settle loans completely, and that he would be paid when those duties were performed. Under the MWPCL, only when McLaughlin completed all those tasks would his right to any payment vest.** Because McLaughlin did not do everything required of him under the contract with respect to the three loans at issue, he is not entitled by law to any compensation for them.

*Id.* (emphasis added).

This case is distinguishable from *Medex* for similar reasons, *albeit* in a different business context and without the benefit of a written policy or employment contract. Unlike *Medex*, commissions in this case were not linked to the arbitrary factor of employment, but to a reasonable job requirement. As in *McLaughlin*, it is not contrary to public policy for Shepherd to decide that commissions will only be earned when an order is shipped. As in *McLaughlin*, there is evidence that the employee knew what efforts were required to earn a commission. Viewing the record in the light most favorable to Shepherd, we find substantial evidence that Hoffeld understood that servicing both the customer and its individual purchase orders through the shipment date was a key element of his job, because substantial changes frequently altered the original order, requiring additional work by both outside and inside sales representatives.

Although the application of Shepherd's "fulfilled order" commission policy must be scrutinized to ensure that it has not been used to circumvent the MWPCL, the trial court's conclusion that Shepherd's policy is based on a reasonable and non-pretextual job requirement reflects a proper analysis. *Compare McLaughlin*, 372 F.Supp.2d at 473–74 (enforcing employer's neutrally applied policy that mortgage broker

earns commission by taking loan to closing) *with Rogers,* 362 F.Supp.2d at 646 (similar commission policy presents a jury question when mortgage brokers were fired before loan closings, possibly for pretextual reasons, so that commissions were either not paid or paid to supervisor of terminated brokers). As detailed above, the trial court credited the longstanding precedent and practical rationale for treating commissions as earned when orders are shipped and invoiced to the customer, a practice Hoffeld himself acknowledged as longstanding at Shepherd and in the industry. Moreover, the record shows that Hoffeld's resignation was voluntary and the dates on which orders shipped were selected by customers.[4] In these circumstances, we cannot say as a matter of law that Shepherd's commission policy violated the MWPCL as applied.

We are not persuaded that a different conclusion is required by the acknowledged exceptions made to Shepherd's policy when a sales representative was reassigned "in-house" and remained with the company. The example described by Pulias related to a "new hire" situation, but Pulias said that it was not done in every instance, that only partial commissions may have been paid in some cases, and that he left Shepherd's employ years before the commissions at issue here were paid. Nor was there any showing that exceptions were made in all cases when the old account representative remained with Shepherd. For example, if a salesman was removed from a particular account "for cause" arising from his work on that account, an exception would not be made.

Thus, Hoffeld did not prove that Shepherd relinquished its prerogative to enforce its commission policy in every instance when the reassigned sales representative stayed with the company. In the absence of such proof, the trial court was entitled to conclude that Hoffeld failed to establish that Shepherd's commission policy as applied effectively conditioned payment of commissions upon continued employment.

---

**4.** There was no allegation that customers conspired with Shepherd to manipulate shipment and invoicing dates in order to prevent Hoffeld from earning commissions.

## II.

### Employment Contract

Hoffeld argues in the alternative that "the trial court erred in finding there was a written contract of employment that contained all terms of employment[.]" To the contrary, he asserts, there was "uncontroverted testimony that there was actually an oral agreement with terms that included [a provision that Hoffeld] was to be paid on particular pieces of business or jobs that [Hoffeld] secured for [Shepherd]." Moreover, Hoffeld complains that "the trial court erred in finding that there was no testimony or agreement concerning when [he] earned his commissions, despite testimony to the contrary."

Hoffeld mischaracterizes the trial court's ruling. The court did not hold that there was a written employment contract, or that there was no agreement concerning when Hoffeld earned his commissions, or that Hoffeld was not owed commission on particular jobs. Read in its entirety and in context, the court's bench ruling cites both testimonial and documentary evidence in support of its finding that Hoffeld did not prove that he earned commissions "on a particular purchase order that was received." As discussed *infra* in Part I, there is substantial evidence to support that finding.

## III.

### Other Commissions

Hoffeld argues that "the trial court erred in validating and endorsing [Shepherd's] dealings with regard to other employees' commissions that were in contravention of the Wage Payment Collection Law as well as being of no relevance to the instant action." He complains specifically that "[t]he trial court gave unwarranted significance to what it deemed as the fact that [Hoffeld] was not making a claim for *every* commission that may have been paid for sales generated prior to his departure from Shepherd."

Hoffeld again mischaracterizes the courts' decision and rationale. He apparently complains about the trial court's observation that "it is also significant that Mr. Hoffeld does not make claim for other commissions that may have been paid after he was terminated from employment for work that was at least generated before he terminated his employment." Yet that point was merely one aspect of the court's extended explanation of why it rejected Hoffeld's contention that commissions were earned when a purchase order was submitted. The court reasoned that Hoffeld's failure to claim all commissions on all purchase orders that were "in" before his termination date is inconsistent with his claim that such commissions were due and owing upon submission of the purchase order. We find no error in the court's consideration of this point.

## IV.

### Procuring Cause Doctrine

At common law, the procuring cause doctrine holds that a salesperson " 'may be entitled to commissions on sales made after the termination of a contract if that party procured the sales through its activities prior to termination.' " *Furth v. Inc. Publishing Corp.*, 823 F.2d 1178, 1180 (7th Cir.1987)(applying Illinois law) (citation omitted). Citing *Butler v. VisionAIR, Inc.*, 385 F.Supp.2d 549 (D.Md.2005), *inter alia*, Hoffeld contends that, "even if we throw out the [MWPCL], there still remains a procuring cause doctrine which is still law in Maryland." As his final assignment of error, Hoffeld asserts that "the trial court erred in not applying the 'procuring cause doctrine' despite evidence that showed [his] efforts and services were the primary, proximate, and procuring cause of business for [Shepherd]."

Shepherd responds that Hoffeld waived this argument by failing to raise it at trial as grounds for recovery. Moreover, Shepherd argues, there is no support in the record or the case law for applying this doctrine beyond its traditional application to real estate brokers. Even if there were, "the issue still

remains a question of whether the salesman did all that he was supposed to do to earn the commission under his employment agreement."

■ We agree that, even if Hoffeld had raised this question at trial, the answer is the same under both the procuring cause doctrine and the MWPCL. For the reasons set forth above, it is the work performed by both outside and inside sales representatives, up until orders are shipped and invoiced, that constitutes the "procuring cause" of any sale made by Shepherd. Thus, the common law doctrine does not override the terms of Shepherd's commission policy.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**